Syllabus.

THE PEORIA AND ROCK ISLAND RAILWAY COMPANY

*v.*

THE COAL VALLEY MINING COMPANY.

| 68 | 489 |
|----|-----|
| 121 | 540 |
| 68 | 489 |
| 51a | 368 |
| 68 | 489 |
| 171 | 396 |

1. RAILROAD CORPORATIONS—*objects of their creation.* The primary consideration and principal object in the creation of railroad corporations, and in conferring upon them privileges not enjoyed by private citizens, was the accommodation of the public and the promotion of their interests. It was not merely to aggrandize and enrich the stockholders. The benefits to be derived by the stockholders are only incidental to accomplish the primary object.

2. SAME—*charters subject to implied duties as carriers.* The right conferred upon railroad corporations in their charters to carry passengers and property for a compensation, is coupled with a corresponding duty that they shall receive and carry passengers and freights over their roads as they may be offered. The acceptance of their charters is upon the implied understanding that they will fairly perform these duties to the public as common carriers of both persons and property, under the responsibility which that relation imposes.

3. SAME—*no power to avoid their duties by contract or otherwise.* The duties which railroad corporations owe to the public, and which are the considerations upon which their privileges were conferred, can not be avoided by neglect, refusal, or by agreement with other persons or corporations. Therefore, any contract to prevent the faithful discharge of any of such duties will be against public policy, and void.

4. Where it was agreed, upon the consolidation of two railway companies, that a corporation which owned one of the roads so consolidated, and which had rolling stock and motive power of its own, should carry coal over a certain part of the road, to a certain amount, without charge, and that the new company should pay the coal company 50 cents per ton for all coal transported by any party except the coal company, it not appearing that the coal company was under any legal obligation to the public to carry coal and passengers after the consolidation, it was *held*, that a court of equity would not enforce the agreement prohibiting the new company from carrying coal except on paying 50 cents per ton, it being the duty of the new company under the law to carry all freights, and the court not having the power to transfer that duty to another.

5. SAME—*effect of consolidation.* After consolidation, the new company becomes liable to perform the duties required of the railroad companies so consolidated, and if no part of the franchise is reserved to either of the old companies, they will not be liable to the public for the performance of duties devolving upon the new company.

APPEAL from the Circuit Court of Whiteside county; the Hon. WILLIAM W. HEATON, Judge, presiding.

This was a bill in chancery, by the Coal Valley Mining Company against the Peoria and Rock Island Railway Company, to restrain the latter company from transporting coal over their road, except on the payment of 50 cents per ton from Coal Valley to the city of Rock Island, etc. The facts necessary to an understanding of the points decided are stated in the opinion.

Messrs. INGERSOLL, PUTERBAUGH BROS. & McCUNE, for the appellant.

Mr. CHARLES M. OSBORN, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This cause was submitted to this court at the September term, 1872, and, after being considered, an opinion was filed and a decree rendered reversing the decree of the circuit court. At this term appellee filed a petition for a rehearing, and, owing to the importance of the question, not only to the public, but to the parties to this suit, as well as on account of the novelty of the questions involved, we deemed it proper to grant a rehearing. The case has been reargued and considered, and we shall proceed to announce the conclusions at which we have arrived, with such reasons therefor as we regard sufficient for the decree we have rendered.

The first question which arises on this record is, whether a court of equity will assume jurisdiction in such a case to restrain appellants from transporting coal over the road unless they shall pay to complainant 50 cents a ton from Coal Valley to the city of Rock Island, or over the bridges north of Coal Valley.

The law under which the contracts for consolidation and running arrangements were made, does not release the road thus formed from the liabilities either road was under or had

incurred, but it renders the new organization, by express enactment, liable therefor. This must be kept constantly in view, or the legislative will may be defeated.

This consolidation was made under the act of 1867, (Sess. Laws, p. 80,) which provides that, in all cases where any incorporated company shall consolidate its property. stock or franchises with any other company or companies, such consolidated company shall be liable for all debts or liabilities of each company included in said consolidated company, existing or accrued prior to such consolidation; and actions may be brought and maintained and recovery had therefor against such consolidated company. But it is urged that the agreement of the 4th of September, 1869, or that between the Coal Valley Mining Company and the Rock Island and Peoria company, are in violation of the duty of the railroad company to the community and opposed to public policy, and should not be enforced.

Have not the public such an interest in the use and continued operation of the railroads of the State as should prevent a court of equity from enforcing a contract forbidding a railroad from carrying passengers or freights? Or where, by the agreement, such a sum is required to be paid for track service, or tolls, as to unreasonably burthen the carriage of persons or property? Or should the chancellor leave the parties to seek a remedy, if they have any, by an action at law?

To determine more accurately the validity or invalidity of the conditions of the agreement in this case, it may be well to consider somewhat the objects that were intended to be accomplished by granting charters to these bodies. The considerations operating on the General Assembly and the people, through their representatives, were two-fold. The first and most important was, the accommodation of the public and the promotion of their interests. The other was, the advancement of the interests of private individuals who should become stockholders in such companies. No one will question the fact that the primary object of the people in bringing these

vast and useful agencies into being was, to afford facilities for travel and commerce, by speedy, convenient and cheap transportation of merchandise, the products and minerals of the various sections of the country, to the best markets, and thus to supply every portion of the country with the products of the other parts of our extended territory. They were needed, and were well adapted to ready and rapid exchange of commodities, and the immediate development of the resources of the country, and have, from an early period, after their first introduction to use, been known and recognized as the greatest of all the means employed by our civilization in advancing the trade and facilitating inter-communication in our country, and they have fulfilled the expectations of the people in this regard.

These were the considerations which, at an early period in the history of the State, induced our people to enter into a vast system of railroad improvements. By it an effort was made, through the agency of the State, and at its expense, to construct railroads traversing its entire limits in every direction, and passing through almost every county in its borders. In the unsuccessful effort, many millions of treasure were expended, an immense debt was contracted that almost bankrupted the people, and entailed upon them a burthen they have not yet wholly removed. But the effort failed, and the people were disappointed in their expectations.

To accomplish the same purpose, the people, in a large number of counties, cities, towns, villages, and in many townships, have incurred debts which, in the aggregate, amount to a vast sum, to subscribe for stock in railroads, or as donations to aid in their construction. Under these immense debts, these municipalities are levying heavy taxes to meet the interest on their bonds issued to pay for such stock, and, with rare exceptions, they receive nothing as dividends, and it is believed that in most cases their stock has been wiped out of existence by sales of the roads under mortgages or trust deeds, and they have nothing to show for the immense

liabilities thus incurred.   Can any one believe that the people have expended these vast sums, and burthened themselves in many instances to the point of ruin, and entailed upon themselves and posterity debts and taxes that must be onerous, if not destructive to their future prosperity, only for the benefit of the private stockholders who now enjoy the franchises and revenues derived from these great bodies?   No one can entertain such an opinion.   All must comprehend the fact that this was all done mainly to promote the public good, and to advance our material interests.

Can any sane person suppose that it was to merely aggrandize and enrich the stockholders and officers of these bodies, that the people, through their representatives in the General Assembly, have granted these liberal charters, these exclusive privileges not enjoyed by the citizens generally,—that they endowed them with the highest prerogative of sovereignty, the power of eminent domain, to deprive the citizen of his property against his will, and at the price fixed by a tribunal selected for the purpose, that it might be appropriated to the use and benefit of these bodies, thus relieving them from the necessity of submitting to unreasonable prices in procuring their right of way, depot grounds and other appurtenances to their roads?   On the contrary, all know such liberality in granting the aid thus afforded, and privileges thus conferred, was mainly to advance the public interest, and private interest merely as an incident.

But to accomplish this great public benefit, it was necessary to enlist private enterprise and capital; and, to call it forth, it became necessary to confer rights, privileges and immunities, which were secured to those who might carry out the enterprise and operate the roads.   These rights are conferred to enable those who advance their means to reap a fair remuneration for the capital and talent employed, thus promoting, primarily, the public good, and secondarily, profit and remuneration for private capital and enterprise.

These being the inducements which led to the formation of these bodies, their charters granted privileges and imposed duties on them. By their charters they are empowered, besides building and maintaining their roads, to carry passengers and property for a compensation; and at the same time a correlative duty is imposed, that they shall receive and carry passengers and freights over their roads, as they may be offered for the purpose. And when they accept their charters, it is with the implied understanding that they will fairly perform these duties to the public, as common carriers of both persons and property, under the responsibility which that relation imposes. And this is a duty they can not escape by neglect, refusal, or by agreement with other persons or corporations that they will disregard or refuse to perform them. These are duties they owe the public, and it was in consideration that they would be performed that their charters were granted. They have no power to absolve themselves from performing these charter obligations, and any effort to do so by contract or otherwise is void.

Whilst railroads must be protected in all of their rights with the same exactness that individuals are, they must at the same time be held to a rigid performance of their duties to the public.

All the roads that are parties to this litigation are common carriers, and owe the duty as such, to the public, of transporting passengers and property when required to perform these duties, and coal is a kind of property suitable and proper to be carried over their several roads, and it must be carried as they do other freight, for all persons who bring it to their roads for the purpose, on the same terms as they do other like freights similar in bulk and in weight; and as common carriers, it is their duty to provide all reasonable facilities for its transportation. And if these bodies have, by contract, bound themselves not to perform these duties, such contracts are *ultra vires* so far as it concerns the public.

But appellees urge that, even conceding these views to be correct, the contract under consideration does not fall within these principles; that appellees owned the road before the sale to the Rock Island and Peoria Railroad Company, and appellees were at liberty to sell or not, and if they chose to sell, they had the power to impose   such terms and conditions as they might determine; that all that was required of them was, that complainants should perform or have performed all of the duties they owed to the public, and that, by the articles of agreement, they bound themselves, or the other company, to perform all of those duties, and that complainants have the rolling stock and other means to fully perform all they bound themselves to, in the agreement; that they have carried all the coal that was offered, and are ready and willing, with all of the means necessary, to transport all the coal shipped from Coal Valley north of Rock river and to Rock Island. And that if they shall do this, then they will have fully discharged the duty appellants owe to the public, and the performance of their agreement can harm no person.

Was, then, the contract entered into by appellants, that they would not carry coal north of Rock river, except on the stipulated terms, in violation of their duty to the public? The Coal Valley company held their bonds to the amount of $150,000, which the Rock Island and Peoria company agreed to pay as a part of the consideration of that purchase, and to permit the former company, in discharge of the interest thereon, being $10,500, to be paid in track service, at the rate of 15 cents per ton, and the Coal Valley company agreed to accept the right to transport 70,000 tons per annum in full of the interest, using its own motive power and machinery therefor; and to pay 15 cents for each ton transported in excess thereof.   And the Rock Island and Peoria company bound themselves to pay the Coal Valley company 50 cents per ton for all coal transported by any party but the Coal Valley company, over the road, north of Rock river. And they agreed that if, within ten days after the expiration of each month,

they should fail to pay the same, then all parties but the Coal Valley company should forfeit all right to so transport coal over the road. And it was declared to be the object and intention of the contract to give no party but the Coal Valley company any right to transport coal over the road to the north side of Rock river, or over the bridges, except when there is nothing due, under the provision, to the Coal Valley company for interest.

It will be observed that the interest due on the debt incurred in purchasing the road was to be paid in track service, at 15 cents per ton on coal, and that the mining company accepted the right to transport 70,000 tons of coal annually, in lieu of money. And it is obvious that the mining company intended to prevent competition in the transportation of coal until they had carried the amount that was conceded to them, in lieu of money, for the interest. And this was done, no doubt, to render the right to carry that amount of coal availing. If the Rock Island and Peoria road and the Rockford and Rock Island Co. might carry coal without limit, they could thus render the privilege to transport coal by the mining company useless to them, and thus deprive them of the interest on the bonds. If the railroad company might supply the market with coal, then the mining company would have, under the contract, no power to collect their interest. This would be manifestly unjust. The mining company have the unquestioned right to their interest, and must be permitted to collect it in the mode prescribed by the contract, unless that contravenes public policy.

The bill alleges, and the demurrer admits, that complainants are ready, prepared, able and willing to transport all coal over that portion of the road that may be required, at a reasonable price.

It is true, that the Coal Valley company are bound by the contract to carry coal, as well as all other freights and passengers that may be offered, for such price as they may reasonably charge therefor. But this is an obligation to the con-

solidated railroad company, and there can be no pretense that any other party could sue upon and recover under that agreement, for a refusal to carry coal. The contract is not made to or with the public, and appellee has not referred us to any law imposing the duty on that company to carry freight and passengers since they have sold the Rock Island and Peoria railroad.

The act under which the Coal Valley company was organized (Sess. Laws 1852, p. 140, sec. 8,) limits such organizations, although the power of transportation is given to and connected with the business which is incident to their mining operations. It would, therefore, seem that, under the general law under which they organized, they did not become general carriers of persons or property. The special act (Private Laws 1865, p. 58,) only seems to legalize the organization of the company and to empower it to purchase the portion of the Rock Island and Peoria road from Rock Island to Coal Valley, and to extend the same, and after purchasing, they should become entitled to all the rights and privileges conferred upon the Rock Island and Peoria company by their charter, and liable to discharge all of its duties. Even if the purchase was valid, the question would arise whether, upon the sale of the road and franchises to the Rock Island and Peoria Railroad Company, the Coal Valley company did not also part with all of the privileges and absolve themselves from the liabilities that charter imposed. In other words, whether, when a railroad company legally sells its road and franchises, it is still liable for the performance of the duties imposed by the charter. We have seen they can not retain their franchises and escape such liabilities, but the question as to the effect of a legal sale has not been discussed, and we decline its decision until fairly presented for determination. If, however, the Coal Valley company owe no such duty to the public since selling the Rock Island and Peoria road, and becoming divested of their franchises, then it would be highly improper to restrain appellants from transporting coal over

32—68TH ILL.

that part of the road which they have bought and now hold. If such is the position of appellees, it would destroy all competition and leave the public at the mercy of that company.

These are the considerations which must prevent us from granting the relief sought, unless it were clearly shown that the appellees are under a legal liability to the public, imposed by their charter or a law binding on them, to perform these duties. even if they could then be relieved in chancery.

We have no power to enjoin appellants from performing a duty imposed by their charters, when such duties are not imposed by law on the other company. The courts can not transfer these charter duties to others upon whom the law has not placed them.

When appellants became invested with the road and franchises of the corporation, they thereby became liable to the performance of this duty, and as no part of the franchise was reserved to appellees when the conveyance was made, they are not, so far as we can see, liable to the public for the performance of duties devolving on their grantee. If, however, this duty is imposed upon appellees by any law to which our attention has not been called, then a different and a very interesting question would be presented. But that not appearing, we must decline to grant the injunction to restrain appellants from transporting coal. But appellees have the right to a decree restraining appellants from using the side-tracks, lateral branches and switches belonging to appellees. This is manifestly just, and the relief must be granted.

We have examined the record with more care, and fully reviewed the grounds of our former decision, and, for the reasons here indicated, are compelled, whatever our inclinations may be, to adhere, on the record before us, to the conclusion at which we previously arrived, except that the decree will be reversed, and the cause remanded, with leave to amend the bill as complainants may be advised, instead of its being dismissed.

Decree reversed and cause remanded.        *Decree reversed.*