WIGGINS FERRY COMPANY, Respondent, *v.* CHICAGO AND ALTON RAILROAD COMPANY, Appellant.

5a 347
31a 109

February 26, 1878.

1. Where a railroad corporation, by a contract of unlimited duration, agreed with a ferry corporation to employ the latter to transport across the Mississippi river "all persons and property which may be taken across the river either way, to or from the Illinois shore," and the ferry company sued the railroad company for damages because the latter had, under directions of shippers and otherwise, sent through another ferry company certain car-freights which the latter had exclusive facilities for transporting over the river in bulk; *held*, that it could not be conceded that it was in contemplation of the parties to the contract that the railroad company should use efforts to force trade out of its natural channels, and that the proper interpretation of the words quoted was, such freights as should come and go in the regular course of business by that route, unimpeded by any adverse efforts of the railway company.

2. The phrase "to or from the Illinois shore," as used in the contract, does not mean all points on the Illinois shore opposite St. Louis.    The ferry company had no franchise to run their ferry at all points opposite St. Louis; and the railroad company had no power to bind itself to refrain from exercising its franchise at a point other than the landing of the ferry company, when the public interests demanded such exercise.

3. Provisions in a contract which clearly tend to prevent competition are void, being contrary to public policy. Courts will not enforce contracts which tend to prevent common carriers from employing improvements or new facilities adapted to their business and the needs of transportation; and contracts between common carriers which imply that the shipper shall be denied the advantage of such improvements or facilities are void as in restraint of trade.

4. A common-carrier corporation cannot so use its franchise as to compel shippers to trade under unnecessary impediments. It was the duty of the ferry company, when the public interests demanded it, to furnish car-transfers; and, as the ferry company was not able to do the business of car-transfer, the railroad company cannot be made liable in damages for using a ferry that could and would do it.

5. Under the evidence in this case, the railroad company was not liable for ferriage of any of the car freights, no such freights being expressly named in the contract, and such freights and methods of transfer not being contemplated by the contracting parties.

6. Where the law refuses its sanction to a contract, its violation can create no cause of action.

7. Courts will take notice of changes in the course of business in the country, and of new processes of practical utility in facilitating trade, and will consider such innovations in adjusting the rights of parties.

APPEAL from St. Louis Circuit Court.
*Reversed and remanded.*

C. BECKWITH, for appellant: The agreement did not preclude the appellant from transporting railway cars, loaded with freight or occupied by passengers, to or from the railroad, or from employing others to do so, or from ferrying, or employing others to ferry, in any mode, between places where the respondent had no ferry, and had no right to have one; nor did the agreement preclude the appellant from employing any ferry service not in existence when the agreement was made, and which the respondent did not agree to perform, and has never been able to perform. — *London* v. *Collegiate Church*, Hob. 303; *Mildway* v. *Standish*, Cro. Eliz. 35; *Hewitt* v. *Painter*, Bulst. 175; *Bridge* v. *Hoboken*, 1 Wall. 116; 2 Beas. 81. The court below erred in holding that the contract of April 28, 1864, precluded the appellant from transporting persons and property, and from employing others so to do, between places to and from which the respondent had no legal right to transport the same, and

that such construction of the contract would not render it void as against public policy. — *Fuller* v. *Dana*, 18 Pick. 472; *Pacific R. Co.* v. *Seeley*, 45 Mo. 212; *Peoria & Rock Island R. Co.* v. *Mining Co.*, 68 Ill. 489; *Marsh* v. *Railroad Co.*, 64 Ill. 414; *The State* v. *Railroad Co.*, 29 Conn. 538; *Raphael* v. *Railway Co.*, 2 Eq. Ca. Abr. 37; *Bank* v. *Adams Express Co.*, 3 Otto, 174. The court below erred in holding that the contract sued upon obliged the appellant not to transport across the river, to or from Venice, cars laden with freight, and that such construction of the contract would not render it void as an unreasonable restraint of trade. — *Oregon, etc., Co.* v. *Winsor*, 20 How. 64. Respondent cannot maintain an action at law against defendant for the non-observance of those provisions of the contract requiring the employment of respondent, and the non-employment of others, to do the ferrying mentioned. — *Mayor* v. *Patterson*, 10 East, 130; *Flight* v. *Glossopp*, 2 Bing. N. C. 125; *Masury* v. *Southworth*, 9 Ohio St. 348; 2 Platt on Leases, 400. The exceptions of appellant to referee's report should have been sustained, and a new trial ordered. — *Hawkins* v. *Bradford*, 1 Caines's Cas. 160; Edw. on Ref. 129, 142; *Perry* v. *Maguire*, 31 Mo. 287; *Brooks* v. *Christopher*, 5 Duer, 216; *Daniese* v. *Allen*, 14 Abb. Pr. 363; *Frost* v. *Smith*, 7 Bosw. 108; *Hatch* v. *Fogarty*, 7 Robt. 488; *Lefler* v. *Field*, 50 Barb. 407; *Mayor, etc.*, v. *Earle*, 10 Bosw. 189; *s. c.*, 24 How. Pr. 358; *Magie* v. *Baker*, 4 Kern. 438; *Cowen* v. *West Troy*, 43 Barb. 48; *Shore* v. *Coons*, 24 Mo. 556; *Ely* v. *Ownby*, 59 Mo. 437; *O'Neill* v. *Capello*, 62 Mo. 203.

JOHN M. WOODSON, for appellant: Referee's report will be set aside for error where the grounds are explicitly stated by him, or the error is apparent on the face of the report. — Edw. on Ref. 149; *Smith* v. *Crews*, 2 Mo. App. 269. The report must correspond with the court's view of the law and the merits of the case. — Edw. on Ref. 149; *Scranton* v. *Baxter*, 4 Sandf. 5. A report which is erroneous on its face may be inquired into, without any exception. — Edw. on

Ref. 17 ; *Levert* v. *Redwood*, 9 Port. 80 ; *Shore* v. *Coons*, 24 Mo. 556. Exceptions to findings of facts not required. — *Daniese* v. *Allen*, 14 Abb. Pr. (N. S.) 366 ; *Hatch* v. *Fogarty*, 7 Robt. 488 ; *Lefler* v. *Field*, 50 Barb. 407 ; *Magie* v. *Baker*, 4 Kern. 438 ; *Mayor* v. *Eben*, 10 Bosw. 189 ; 24 How. Pr. 358 ; *Hunt* v. *Bloomer*, 3 Kern. 341 ; *Johnson* v. *Whitlock*, 3 Kern. 346. Where the referee states all the facts correctly, but is mistaken as to the legal consequences of those facts, it is not necessary to except to the report. — *Adams* v. *Claxton*, 6 Ves. 226 ; 1 Barb. Ch. 553 ; 2 Dan. Ch. Pr. 1314. If the clear weight of evidence shows that the referee has erred, or if his finding is in direct violation of some rule of law, the court will review the report. — Edw. on Ref. 14, and cases cited. "The court may set aside the finding of the referee, and, on the facts as presented by his report, find a different result, and enter up a decree accordingly." — *O'Neill* v. *Capelle*, 62 Mo. 203 ; *Ely* v. *Ownby*, 59 Mo. 437.

JAMES O. BROADHEAD, for appellant: The ferry company's franchises being *exclusive* or *perpetual*, "they must be strictly construed ; nothing is to be presumed as against the State or the public." "It must be confined to the powers expressly given it, withholding all others, to be used for the public good, as other demands arise, and as other, cheaper, improved, or more convenient modes of transportation may be demanded." This rule of construction applies to the *kind* and *mode* of ferriage contemplated, and to the *place* or *locality* contemplated at which the ferry service was contracted for, as well as the extent and nature of all other stipulations of the contract. — *St. Louis Gas-Light Co.* v. *City of St. Louis*, 46 Mo. 121 ; *Bridge Proprietors* v. *Hoboken*, 1 Wall. 117 ; *Thompson* v. *Railroad Co.*, 3 Sandf. Ch. 625 ; *McKee* v. *Railroad Co.*, 2 Jones L. 186. Contracts made by individuals and private corporations in restraint of trade, which are *general*, are void. The true test is, whether the restraint is such only as to afford fair protection to the parties, or whether it is so broad as to

" interfere with the interests of the public ;" and all such contracts, the provisions of which, if carried out, will be injurious to the public interests, are void on the ground of public policy. — *Morris Run Coal Co.* v. *Barclay Coal Co.*, 68 Pa. St. 173 ; *Crawford & Murray* v. *H. B. Wick*, 18 Ohio St. 190 ; *Bennett* v. *Dutton*, 10 N. H. 481 ; *White* v. *Hunter*, 23 N. H. 134 ; *Weld* v. *Lancaster*, 56 Me. 453 ; *Skeele* v. *Phillips*, 54 Ill. 315 ; *VanDyck* v. *Hewitt*, 1 East, 98. Common-carrier corporations cannot make valid contracts whose operation would be in restraint of trade, or which would prevent the carrier from employing the best modes of serving the public. — *Peoria, etc., Co.* v. *Coal, etc., Co.*, 12 Am. L. Reg. (N. S.) 277 ; *Marsh* v. *Railroad Co.*, id. 390 ; *Chicago & North-Western R. Co.* v. *The People, etc.*, 56 Ill. 366 ; *Pacific R. Co.* v. *Seeley*, 45 Mo. 212 ; *New England Express Co.* v. *Railroad Co.*, 57 Me. 188 ; *The State* v. *Railroad Co.*, 29 Conn. 539.

GLOVER & SHEPLEY and NOBLE & ORRICK, for respondent : One who accepts a deed, or other instrument conferring a benefit upon him, assents to the terms which it imposes and the considerations it specifies, and agrees to perform these terms and pay the considerations, in manner and form as set down in the instrument. — *Benton* v. *Wells*, 30 Miss. 689 ; *Attix* v. *Pelon*, 5 Clarke Ch. 336 ; *Patchin* v. *Swift*, 21 Vt. 298 ; *Goodwin* v. *Gilbert*, 9 Mass. 510 ; *Guild* v. *Leonard*, 18 Pick. 511 ; *Felch* v. *Taylor*, 13 Pick. 133 ; *Pike* v. *Brown*, 7 Cush. 133 ; *Aiken* v. *Railroad Co.*, 26 Barb. 389 ; *Stow* v. *Wyse*, 7 Conn. 214. When one contracts with another to do an act beneficial to a third person, the latter may accept the obligation, and sue upon it. — *Bird* v. *Lanius*, 7 Ind. 615 ; *Davis* v. *Calloway*, 30 Ind. 112 ; *Felton* v. *Dickenson*, 10 Mass. 287 ; *Hall* v. *Marston*, 17 Mass. 575 ; *Carnegie* v. *Morrison*, 7 Cush. 381 ; 2 Metc. 393 ; *Delaware* v. *Westchester*, 4 Denio, 97 ; *Ellwood* v. *Monk*, 5 Wend. 235. Estoppel. — *Garnhart* v. *Finney*, 40 Mo. 449 ; *Chouteau* v. *Goddin*, 39 Mo. 229 ; *Bunce* v. *Beck*, 46 Mo. 327 ; 11 Greenl., sec. 207. The contract

was not in restraint of trade. — 2 Pars. on Con. 747 ; *Jones* v. *Edwards*, 3 Camp. N. P. 285 ; *Morris* v. *Coleman*, 18 Ves. 437 ; *Holcomb* v. *Hewton*, 2 Camp. N. P. 391 ; *Peirce* v. *Fuller*, 8 Mass. 223 ; *Hayward* v. *Young*, 2 Chitty, 407 ; *Bragg* v. *Tanner*, 2 Cro. 597 ; *Davis* v. *Mason*, 5 Term Rep. 118 ; *Bunn* v. *Guy*, 4 East, 190 ; *Lyman* v. *Perkins*, 9 Mass. 522 ; *Rannie* v. *Irvine*, 7 Man. &. G. 969 ; *Dunlop* v. *Gregory*, 10 N. Y. 241 ; *Palmer* v. *Stebbins*, 3 Pick. 188 ; *Richmond* v. *Dubuque*, 33 Iowa, 475. Where one contracts with another that a third person will do some possible and lawful thing, the agreement is binding, and the promissor must pay the damages if the thing is not done, although he had no power to compel such third person to do what he promised. — *Dougherty* v. *Neal*, 1 Saund. 216 ; *Herketh* v. *Gray*, Say. 185 ; *Mounsey* v. *Drake*, 10 Term Rep. 29 ; *Fisher* v. *Presberry*, 18 Mo. 50 ; *Long* v. *Towle*, 42 Mo. 545. If contracting parties would have the benefit of exceptions, they must be inserted in the contract. — 1 Dall. 210 ; *Warner* v. *Hutchins*, 5 Barb. 671 ; *Adams* v. *Nichols*, 19 Pick. 276 ; *Jzon* v. *Gonton*, 5 Bing. 501 ; *The Brecknock, etc.,* v. *Pritchard*, 6 Term Rep. 750 ; *Worsely* v. *Wood*, 6 Term Rep. 718.

HAYDEN, J., delivered the opinion of the court.

This is an action to recover damages for breaches of a written contract, of date April 28, 1864, between the respondent and the appellant's assignor. Both parties to the suit are corporations incorporated by acts of the General Assembly of the State of Illinois, the respondent operating a ferry across the Mississippi River from Bloody Island, a part of the Illinois shore opposite St. Louis, to that city. The respondent was incorporated in 1853, but its franchise, which is perpetual, dates from 1819. The location is fixed by law within certain limits. The Alton and St. Louis Railroad Company, the appellant's assignor, was incorporated by the Legislature of Illinois to construct and

operate a railroad from Alton, in Illinois, to any point on the Mississippi River opposite St. Louis, with power to lease or sell its road and franchises to any corporation having a connecting railroad. Under this power, the Alton and St. Louis Railroad Company, on April 16, 1864, leased its road to the appellant, by lease which provided that the appellant should finish the road between its termini, Alton and Bloody Island, and forever use and operate it as a part of the main line of the Chicago and Alton Railroad, which accordingly acquired the franchise and road, and which had authority to transport freight and passengers on its road to and from St. Louis, and for that purpose to own such boats as should be necessary.

The contract sued on, which was made by the Alton and St. Louis Railroad Company with a view to its being assigned to the appellant, and which was so assigned on the day of its execution, recites that the respondent is anxious to secure to itself " the ferrying business between the Illinois and Missouri shore, opposite to the city of St. Louis, of all the freights and passengers carried or to be carried " by the appellant's assignor, and also the sum of $2,500 per annum ; and that, on its part, the appellant's assignor wishes to secure proper facilities for the operation and doing of the business of its road at its western terminus on the Mississippi River opposite to the city of St. Louis. The agreement declares that it was made for the purpose of securing these objects to the respective parties. It then conveys to the railroad company, forever, a tract of land on Bloody Island four hundred feet in width and fifteen hundred feet in depth, bounded on the west by a line two hundred and sixty feet from low-water mark of the Mississippi River ; also the right of way through the respondent's lands ; the grant to be for so long as the premises should be used for railroad purposes. Provisions are made for the construction, by the railroad company, of depots, warehouses, tracks, etc., and for such other buildings as may be necessary or conve-

nient in order to transact its business. The covenants are given below. Under this contract the appellant at once entered into possession of the premises, proceeded to erect buildings and use the land for its purposes, and has since paid rent up to March 30, 1870, after which the respondent refused to receive it.

The complaint made upon the part of the respondent, the plaintiff below, is that, while it procured good and convenient boats, and has, according to its contract, been ready to do, with promptness and despatch, all the ferrying required for transportation across the Mississippi River of all passengers and freight coming from and going to appellant's railroad, the appellant refused to give to the respondent such ferriage as the contract called for, and gave it to other persons, and that in this way respondent has lost profits of transportation over the river to the amount of $200,000. The substantial controversy is in regard to the transfer by another ferry company, called the Madison County Ferry Company, across the river, of certain cars of merchandise, in bulk, sent in a car-transfer ferry-boat, the ferriage of which across the Mississippi, as the respondent claims, belonged to the respondent, under the contract of April, 1864. The Madison County Ferry Company, which, for brevity, will be called the Venice ferry, as this company operated a ferry from Venice, in Madison County, Illinois, across the river to St. Louis, was also incorporated by act of the Legislature of Illinois, it having begun to do business about the year 1840. The charter authorized the Madison County Ferry Company to establish a ferry at a certain point in Madison County, the county next north of St. Clair County, in which lay East St. Louis and Bloody Island, where the ferry of the respondent was. The ferry privilege of the Venice ferry was from the point in Madison County to the opposite shore, or the city of St. Louis, and the act of Feb. 11, 1853, which incorporated the respondent, provided that its act of incorporation should not be construed

to interfere " with any ferry now established by law," or with the powers, privileges, or franchises granted by the act incorporating the Madison County Ferry Company. The distance from the northern boundary of the respondent's lands in St. Clair County to the southern line of Madison County is about thirty-two hundred feet, and the distance between the two ferries, — that is, from the point in St. Clair County at which the respondent's ferry operated to the point in Madison County where the Venice ferry was, — is about three miles.

While the respondent continued to do the ferrying for the appellant at the terminus of the latter's railway, business arose at the point called Venice. It appears that in 1866, or shortly before that year, a cattle trade, or business of transportation of cattle, grew up in the vicinity of Venice, and that owners of cattle offered for shipment at Venice, upon the appellant's railroad, cattle in considerable numbers ; that these owners, or some of them, were accustomed to bring their cattle to Venice from the West, and cross the river by the Venice ferry, and at that point to make their shipments by rail to the East by the appellant's road. In 1866, owing to increasing business, there was a demand for a station upon the appellant's road at Venice. It appears that in order to get lands for a station and the necessary buildings, and also, it would appear, for a stock-yard, that the cattle trade might be accommodated, the appellant made, on March 9, 1866, a contract with the Madison County Ferry Company. By this contract, the making of which is complained of by the respondent as a violation on the appellant's part of its obligations to the respondent, the Venice Ferry Company conveyed to the appellant a right of way for its road, to be used in connection with its main track, and also a strip of land one hundred and fifty feet in width, lying near Main Street, in the town of Venice, on condition that the land should be used for the purpose of a freight and passenger station, grain-elevator, and for other purposes

connected with the appellant's track at that point. The ferry company agreed to keep enough steam ferry-boats in working condition to accommodate the business and traffic of the railroad company which should of necessity be done by means of ferry-boats at that point, and to do ferrying " necessary to be done at said point " at fair rates, and at such as should not exceed the prices charged by other ferry companies engaged in like business at or near the premises conveyed. On its part the appellant agreed, within five months, to grade and lay all tracks, etc., " in order to readily transact all business and traffic which may be destined to said point, from any place on the line of railroad now operated by it, etc., and all business and traffic which may be sent from said point on the line of said railroad," etc. ; agreed, further, to establish a local station for passengers and freight at the town of Venice, on its railroad ; and that it would not establish, or assist in maintaining, any other ferry company intending to compete with the Venice Ferry Company " for the ferrying business to be done from the lands of the first party, in Madison County and at said station of Venice ; and that it, said second party, will not seek to divert traffic which may be offered for said station and ferry, to other points on the line of the railroad now operated by it ; " and that it would offer the same facilities for business at Venice as at other points on its road. It was also agreed, by this contract, that if it should at any time be advisable to adopt a method of transporting freights and passengers across the Mississippi River at Venice Station differing from the existing method, and if it should, in consequence, be necessary to construct a new landing, adapted to the new mode of transfer, then the railroad company should, at its own cost, erect such new landing at some point upon the river-front of the premises conveyed, and that the railroad company would, in such case, build and maintain the tracks necessary to render the landing available for the new mode of transfer, etc.

It does not appear that, under these last clauses, any thing was done in the first instance by the appellant in regard to any new mode of transportation ; but under the other provisions of the contract the appellant built a station-house and other buildings to accommodate the wants at Venice, established a stock-yard for the cattle collecting there, and laid a switch-track to the river.

In 1869, an important change took place in reference to transportation of grain and other freights across the Mississippi River. All freights had hitherto been sent across the river at St. Louis upon wagons, which were driven upon the ferry-boats. Car freights, or cars filled with goods or merchandise, were, before 1869, sent across the river without breaking bulk, at Quincy, Burlington, and other points, either by car-transfer, ferry-boats, or bridges ; and this method being much more rapid, safe, and inexpensive, through freights were seeking other routes than that by way of St. Louis. The public demand, especially among merchants in the vicinity of St. Louis, for a car-transfer there, was very strong. The evidence shows that by the method pursued at respondent's ferry, of breaking bulk at the river, transferring by wagons, and by the consequent necessity of again unloading and reloading at St. Louis, in case of through freights, damage was done to goods, great delays and extra expenses were entailed, as compared with the method of car-transfer by which cars from the track of a railroad on one side of the river were, by a boat adapted to that purpose, transferred directly to the track of a railroad on the other side of the river. Thus a demand sprung up for a car-transfer near St. Louis, and certain persons purchased the ferry rights of the Venice Ferry Company, procured a car-transfer boat, and there established, in the spring of 1869, a car-transfer ferry, connecting the roads at Venice with the railroads, or some of them, upon the St. Louis side of the river. When this was thus established, the appellant, by means of the track which extended from the

main line to the river, was enabled, both for itself and, afterwards, for other railroads near it, to transfer bulk freights in unloaded cars across the river to and from St. Louis. At this time, and for a year after the establishment of the car-transfer at Venice, the respondent had no car-transfer, but continued as before to transfer freights in wagons. The respondent, however, had sufficient boats and appliances to transfer the freights, by its ferry, which were transferred by the Venice ferry. It seems that the appellant transferred by the Venice ferry only cars of freight, while other freights were sent by respondent's ferry. No question, at least, is now made in regard to other freights than those bulk freights transferred in cars by the Venice ferry.

After the establishment of the car-transfer at Venice, this route was much preferred by shippers. In comparison, the route by East St. Louis was subject to great delays and extra expenses. Freights for the respondent's ferry would sometimes be delayed for several days in getting over the river, so that they accumulated, and it became necessary to notify shippers that their consignments could not go forward at once. The result was, that consignees at St. Louis, to a considerable extent, directed their shippers to send by way of Venice. It does not appear that this change was owing to unfair conduct or favoritism on the part of the officers of the appellant's road, but because the old method of transfer was inadequate to the new demands of trade, stimulated as they had been by the improved facilities. It seems clear that the introduction of the car-transfer system very considerably increased the volume of freights passing over the river at St. Louis. The appellant, indeed, availed itself of the advantage of its position at Venice, and of its car-track which led to the river; and other railroad companies using this track paid a compensation for its use, to the appellant. It also appears that certain shippers and consignees doing business in the northern part of the city, where the Venice ferry connected with a railroad at St.

Louis, found it much more convenient to use that ferry, in their business with the appellant, than the ferry of the respondent. From this time, the spring of 1869, forward, the appellant sent by way of the Venice ferry its car-freights going either east or west across the Mississippi. It made no demands upon the respondent to establish a car-transfer at East St. Louis or Bloody Island. It appears, however, that in August, 1870, at a meeting, held at the respondent's office, of several representatives of railway companies, this subject was brought forward, and that the respondent, some time in 1870, established a car-transfer at its ferry, above the grounds occupied by the Ohio and Mississippi Railway Company at East St. Louis, which grounds lay between the river and the grounds of the appellant. There was no connection between this transfer and the grounds or track of the appellant, and the practicability of making such a connection as to be available is one of the disputed points in the case. No such connection was ever made; and after respondent had established its transfer, the appellant continued, as before, to use its own track to the river at Venice, and to deliver car-freights to the Madison County Ferry Company.

The court below heard evidence upon the main issue; gave and refused instructions, which need not be set out; and, having found that the defendant was liable, and had made out no defence, referred the case to a referee to take testimony, to state an account, and to assess damages. The appellant filed its motion for a new trial, which was overruled; and the referee, after taking voluminous testimony, made a report, the conclusion of which was that the appellant was liable for profits on ferriage of 21,065 cars transferred by the Madison County Ferry Company from Venice to St. Louis, and 2,810 cars transferred from St. Louis to Venice. The damages, including $5,000 rent, the referee assessed at $103,879.34. Exceptions to the report were filed and overruled. The case is here by appeal.

As, after careful consideration, we are all agreed that this cause went to the referee upon erroneous instructions, and that in making his report the referee did not proceed upon a correct legal theory, it is unnecessary to consider many questions which have been elaborately discussed at the bar. Thus the error committed by the court below, for such we think it was, in refusing to review the evidence, and to give the appellant the benefit of that revision, to which it was entitled under its exceptions that the finding of the referee was against the evidence and the weight of evidence, becomes a matter of no moment. The important question is as to the contract between the respondent and the appel-lant's assignor.

As serious disputes have arisen in regard to the construction of this contract, it is certainly proper to look at it in the light of the facts surrounding it when it was made. This is the more important as the contract, on its face, in some material particulars, is indefinite, not to say ambiguous. It becomes positively ambiguous when the respondent introduces its evidence, and claims as a breach the transportation across the river, by the Venice ferry, of the loaded cars. No such freights are expressly named in the contract, and there is in it no allusion to any such method of transportation as that by which these were carried. There is in the contract no indication that, at the time the contract was made, such freights, or methods of transportation, were contemplated by the parties to it, or by the appellant; and the surrounding facts as developed by the respondent's evidence show that such freights, so to be transported, could not have been within the contemplation of the parties. It is the respondent who must, in the first instance, resort to construction in order to maintain its theory.

But if we take the contract as it is on its face, we see that there is, as applied to the matter now in dispute, a want of certainty, a lack of precision in its terms. The clauses containing the material covenants are as follows:—

" In consideration of the said covenants, the said party of the first part further agrees to furnish and maintain a good and convenient wharf-boat and steam ferry-boats, to do with promptness and despatch all the ferrying required for the transit of passengers and freight coming from or going to said railroad (or the assignee hereinafter mentioned), over the river, navigation permitting, except that the said ferry company may abandon the business at any time, by giving the railroad company six months' notice of their determination to do so ; in which event, the right of the said party of the second part herein to the possession of the parcel of ground above specified shall remain unaffected, except as to the payment of the said twenty-five hundred dollars, which is to be paid in any event.

" The rates of ferriage to be charged on such freight and passengers shall be reasonable ; and if at any time the railroad company shall be dissatisfied with the rates charged, and the ferry company shall not be willing to reduce the same, the question at issue shall be submitted to the decision of arbitrators, to be appointed in the manner hereinafter provided.

" In consideration of the lease aforesaid, and the covenant entered into on the part of the said ferry company, the said railroad company covenants and agrees that they will always employ the said ferry company to transport across the said river all persons and property which may be taken across the said river either way, to or from the Illinois shore, either for the purpose of being transported on said railroad, or having been brought to the said river Mississippi upon said railroad, so the said ferry company, its legal representatives or assigns, owners of the said ferry, shall have the profits of the transportation of all such passengers, persons, and property taken across said river either way by the said railroad company, and that no other than the Wiggins Ferry Company shall ever at any time be employed by the said party of the second part, or the assignee herein mentioned,

to cross any passengers or freight coming or going on said road.

" And the said party of the second part, in consideration of the leases aforesaid, further covenants and agrees to pay it, the said party of the first part, or its assigns, the annual sum of twenty-five hundred dollars, to be made in quarterly payments, and to continue as long as the said party of the second part shall, under the lease herein given, continue to enjoy and possess the piece or parcel of land above described."

The question arises, What passengers and what freights are here provided for? If we resort to the covenant first given, we find the answer is contained in the predicate of the proposition, or in the words " coming from or going to said railroad * * * over the river." It is these words which are used to describe the freights and to affix a character to them. The expression " freights coming and going" seems especially to have dwelt in the minds of the parties, or in the mind of the draughtsman, whose words they accepted. The railroad company covenants that no other than the respondent shall ever, at any time, be employed by the railroad company " to cross any passengers or freight coming or going on said road; " while further on, in the covenant in regard to keeping open a space for a wharf and street, the expression " coming or going as freight on its road " is employed. In construing a writing, it cannot be denied that there is a significance arising from the frequency with which words are used, when they are used in one and the same signification. Where the question is one of description, and where the mind of the writer, as it recurs to the subject, recurs also to the description, the inference as to intention is strong. In view of this, and of the rule that words and phrases are to have that peculiar sense which the language attaches to them, it would seem that by these expressions were intended such freights as should come and go, in the regular course of business, unimpeded by any

adverse efforts of the railroad company.   There is certainly nothing in these phrases to indicate that the railroad company engages to divert trade, or to compel it to leave that course which it would of itself take, and come into that particular channel.   The words, on the contrary, give color to the other construction.

Against the impression thus derived from these covenants there is nothing to militate in that which provides that the railroad company will always employ the respondent *to* transport " all persons and property which may be taken across said river either way, to or from the Illinois shore, either for the purpose of being transported on said railroad, or having been brought to the said river Mississippi upon said railroad," etc.   The persons and property here described are those of whom the above qualities have been predicated, and it is of course assumed that such " may be taken across the river."   There is nothing here indicating other persons or property than such as the course of trade would bring to be taken across the river.

The clause last quoted, however, though itself indefinite, is less so than the others in regard to another material term of the contract, — that is, the particular point or locality to which the contract relates.   In none of the covenants is the city of St. Louis named ; while in all, except that last quoted, the locality is left undescribed.   At what point these freights are to be " coming from or going to said railroad" these other covenants do not say ; but that last quoted uses the words, " all persons and property which may be taken across the said river either way, *to or from the Illinois shore.*"   Even here there is no limit to the city of St. Louis ; and these words, as well as the words which occur in the recital where the city of St. Louis is named, must be considered with reference to the rest of the contract, and to the facts surrounding its execution.   Contrasting this use of general terms with the language made use of in the contract between the appellant and the Madison County Ferry Com-

pany, we find that the latter contract provides for such business and traffic which shall of necessity be done by means of ferry-boats *at said point*, and for " all business and traffic which may be destined *to said point*," etc. ; while the railroad company covenants that it will not assist in maintaining any other ferry intending to compete " for the ferrying business to be done *from the lands of the first party*, *in Madison County*, *and at said station of Venice*," etc. A party cannot, by merely using general words, extend a contract beyond what would otherwise be its proper and legitimate scope ; and where, as in the present case, the words are such as necessarily require some limitation, since the Illinois shore, without limitation, is not meant, the question becomes one of degree. Here, when the respondent contracted, it knew it had not, and could not have, the power to ferry between the city of St. Louis and all parts of the Illinois shore opposite the city ; and, consequently, it knew that that was not the meaning of the contract.

It is, then, an assumption that the contract provides for the ferriage of passengers and freight going to any part of the city of St. Louis from any point on the appellant's railway opposite to that city. Without the insertion of more definite terms into the contract, it does not, when the covenants are taken together, bear that meaning ; and if such an implication could arise from the words, the surrounding facts would show the construction to be erroneous. Apart from any question as to public policy or restraint of trade, the effort to impress this meaning upon the contract is an effort to give it a scope and reach which, in the light of the circumstances surrounding its execution, it cannot be made to possess.

As principles are best illustrated by marked examples, let it be supposed that the city of St. Louis had a riverfront of twelve or fifteen miles on the Missouri bank, extending from north to south ; that respondent's railway, running along the opposite shore, terminated at a point in

Illinois opposite the extreme southern end of the city; that a contract in the words of the present was made; that several years after its execution the increase of business should lead to the establishment of a station upon the appellant's road opposite to the northern end of the city; that trade should gather at this new station, and passengers and merchandise coming from the northern part of the city should find an outlet there, while, on the other hand, traffic passing westward should seek to discharge itself into the city through this same channel; — would it be contended that the railway company would be obliged, by the terms of its contract, to refuse to employ a ferry company which, before the contract was made, had had a ferry in operation between the two northern points? Surely, no such construction could reasonably be put upon the contract, extending, as it would, indefinitely into the future.

There is no propriety in giving the construction contended for, as the contract has its fair scope and operation. The assumption is gratuitous that the contract means this or nothing. In a commercial country, especially in one rapidly advancing in an industrial point of view, it may well be presumed that two incorporated companies engaged as common carriers in the business of transportation, when they make a contract without limit as to time, have in view those causes which, by analogy and from their uniform action, are called the laws of trade. Where the subject-matter of the contract is commercial traffic, it must be presumed that the parties bore in mind what all commercial experience teaches, — that commerce is constantly seeking, and, in the absence of vexatious restrictions, finding, new and more advantageous channels, by a law of being which is as natural to it as is to water that physical law by which it seeks and finds its level. Selfish interest, constantly at work, creates this uniform action; and shipper and consignee, as these carriers well knew when they contracted as to a subject involving the interests of shipper and consignee, will

send their goods by routes which best subserve their purpose. These are considerations that enable us to arrive at the intention of the parties and the reasonable construction of the contract, where its meaning is in doubt; and it is no answer to say that parties can contract for any thing that is not physically impossible or legally forbidden. The question is as to the scope of the contract, — as to how far it reaches; and the argument which proves what the parties must be presumed to have had in their minds, proves, so far, the proper interpretation.

If, indeed, the contract had no operation outside of the construction contended for by the respondent, it might be different. The contract of March 9, 1866, is, as has been seen, carefully limited; yet it appears that with all its limitations it has a substantial scope. But the contract of April, 1864, has a much wider scope, and contains still more substantial considerations for the benefits which its execution secured to the appellant. Here was the terminus of a leading railway line connecting two great cities, and at East St. Louis, near the respondent's ferry, were to be passenger and freight depots upon the land conveyed by the contract. Whatever changes the course of trade might make, there would necessarily be a great volume of traffic brought by the appellant's railway to the respondent. The evidence shows that such was the fact. There is no question as to a contract without scope or operation, but as to what freights come fairly within its purview. As it would be unreasonable to suppose that two commercial corporations, contracting upon a commercial subject-matter depending on the interest of third persons, contracted wholly without reference to the conduct of those persons, and without reference to well-known usages of commerce; as in this contract no specific freights are named, but only a general class of freights; and as this class-description, by its terms, points to that business which shall freely come and go, — these facts, especially when taken in connection with the perpetual

duration of the contract, are the *indicia* which show what passengers and what freights were within the contemplation of the parties.

In the contract of 1864, the charters of the contracting parties are referred to, and these, as well as the charter of the appellant, must be considered as having been in view of the parties. One of the powers and franchises committed by the Legislature of Illinois to the appellant was to transport persons and property to and from St. Louis, Missouri. This necessarily carried with it the power to convey passengers and freight from Venice, Illinois, to St. Louis, Missouri, and from St. Louis to Venice, in case the interests of the public and of shippers demanded such transfer. It negatived any inference that the interests of the public and of shippers could be sacrificed by a refusal on the part of the appellant to use its franchise for the purpose of transporting passengers and freights to or from St. Louis by way of Venice, when the public interest demanded such transfer. But the respondent knew that it had no power to transfer passengers or freights from Venice to St. Louis, or from St. Louis to Venice, by its ferry. When it made its contract, it contracted in view of these facts, and was bound to know that, in case the public interests demanded, passengers and freights would have to be transported by way of the Venice ferry to and from St. Louis. The respondent could not contract to convey freights to or from Venice, in violation of its charter; and the appellant could not bind itself not to exercise powers committed to it by the State of Illinois for public purposes. The parties could not contract with a view to the violation of law, and certainly the presumption is that they did not so contract; and accordingly, for this, as well as for the reasons given, the words " to and from the Illinois shore," in the agreement, must be limited to a reasonable meaning.

The question is not now as to what individuals might do, or how far they can bargain away their rights, but as to corporations which are common carriers, and hold franchises

in trust for the public. Such corporations cannot defeat the purposes for which the State has intrusted them with valuable franchises, which, by their nature, tend towards exclusion. It is for the accommodation of the public that they hold these extraordinary powers, and to the public interests those of their stockholders are subordinate. Such corporations cannot bargain away their powers, so as to injuriously affect the public. The grant of the franchise implies the duty to use it so as to make the grant effectual; and the law will not enforce contracts which tend to prevent a railway company from employing those facilities which are adapted to its business and the needs of transportation. *Peoria, etc., R. Co.* v. *Coal, etc., Co.,* 68 Ill. 489; *Hartford, etc., R. Co.* v. *Railroad Co.,* 3 Robt. 411; *Shrewsbury, etc., R. Co.* v. *Railway Co.,* 21 Eng. Law & Eq. 319–329. See *Bennett* v. *Dutton,* 10 N. H. 481.

The present case extends not merely to the use of certain improvements in transportation, but to the use of franchises granted by a State to incorporated common carriers. By its charter, the appellant has the right to use "such boat or boats as may be necessary" to carry passengers and freights from Alton and other points on its road to St. Louis, etc. This act must be considered in reference to that granting to the Venice Ferry Company its exclusive privileges. That there was a public demand for the use of the Venice ferry in connection with the appellant's road, for car-freights, is beyond dispute. We may suppose that the assumed legal effect was expressed, in plain words, in the contract; the question would then be squarely presented whether the law would sanction an agreement by which one public carrier deprives itself of the power to exercise one of its franchises, and of the power to employ another common carrier having an exclusive franchise, when the exercise of both franchises is demanded by the public convenience. In *The State* v. *Hartford and New Haven Railroad Company,* 29 Conn. 538, the defendant, under contract with another railway company,

instead of running to its terminus, so as to connect with a line of steamboats, had diverged at a point about a mile and a half from that terminus at tide-water, so as to take passengers only to its depot at New Haven.   It was held that, as those wishing to use the steamboat route in connection with defendant's railroad were incommoded by this change, *mandamus* lay to compel the defendant to run passengers to its tide-water terminus, and that the contract with the other railroad company, to use the language of the court, " amounted to nothing."   As it is well settled that a railroad company may forfeit its franchises by refusing to use a part of them, the use of which is convenient to the public, it is difficult to see how the law can consistently enforce a contract which to any extent implies such a refusal.   So a refusal by a railroad company to grant station accommodations, under proper circumstances, or to employ such natural or artificial advantages as are within its reach and greatly conduce to an efficient performance of its duties to the public, is within the same principle.   Regard must be had to the facts that the company accepts the franchises together, that it excludes other persons, and yet refuses to use the franchises as in better hands they might be used.   As the law directly forbids, so it will not, by enforcing contracts of a certain kind, indirectly sanction the abuse of the powers intrusted to corporations.   For a railroad corporation to refuse to exercise any powers which are mediately or immediately intrusted to it, the non-use of which is of public inconvenience, is so far an abuse of authority.   If there had been no contract in question here, the appellant would have undoubtedly used, to the great advantage of the public, its power to connect with or employ that carrier to which the State of Illinois had granted the exclusive privilege of ferrying between certain points opposite the northern part of the city of St. Louis and that city.

A still further objection is, that the contract, if interpreted as contended for by the respondent, would be in restraint

of trade.  The freights must, of course, be given to some one.  This is not the objection, that they are given to the respondent, or that the contract is in restraint of trade, because it supposes that the appellant is to compel passengers or freights to adopt this route.  If a person engages to furnish passengers or freights for a bottom, and fails, it is of course no excuse to urge that they would not come or could not be got.  But this argument does not prove that the present contract applies to the freights here in question, or that a contract to convey specific freights is the analogue of a contract to carry freights which are indefinite, and have, to a great extent, only a future and possible existence.  A contract that specified goods shall go by a certain vessel, and the contract of a common carrier, which is also a railroad corporation, that it will for the future divert the goods intrusted to it from those routes by which it is bound by its obligations to the public to send them, and by which it would send them were it not for the contract, are obviously different things.  The restraint of trade lies, in the first place, in this: that the construction contended for necessarily implies that if improvements are made, if new facilities are brought into play, by which a transportation more rapid, safe, and cheap can be obtained, the shipper shall be denied the advantage of such facilities, and the carrier shall not use them.  The facts of this case afford the illustration.  Though car-transfers were established at other towns upon the Mississippi, and though one was in operation at Venice, it is contended that the appellant was bound to deny the owners of car-freights coming over its road, irrespective of their interests or of their positive commands, the use of the only facilities by which a rapid transfer could then be secured.  Thus shippers would have been obliged to have their car-freights unloaded at the appellant's terminus, there put into wagons, and thus transported by the respondent's boat to St. Louis, there to be detained and again unloaded, and, in the case of through freights, reloaded into cars.  This state

of things, too, was to continue indefinitely in the future.
By parity of reasoning, whatever facilities trade might find,
and however the respondent might refuse to make use of
any such facilities, these restraints would have to be sub-
mitted to.   The more direct and immediate objection to
such a view is, that there is no such contract, because the
parties made none.   The obligation is reciprocal; and if, on
the one hand, the contract is to be extended to car-freights,
on the other, the respondent was bound to furnish accom-
modations for such freights.   But, supposing the contract
to have the scope contended, and to include car-freights
which were shipped by the appellant upon the transfer-boat
at the Venice ferry, that it would be in restraint of trade
and against public policy is clear.

To a great extent the property was necessarily not in ex-
istence when the contract was made, but upon the present
hypothesis it included all freights which, in the future, were
to pass for transfer across the Mississippi River from or to a
leading line of railway, one of the highways of the country,
having for its termini two of the largest of its cities.   In so
far as this contract provided that, though there were facilities
for bulk transfer at hand, freights, though shipped to be
transferred in bulk, should not be so transferred, but should
be carried across the river by respondent's ferry in wagons,
so far it was in restraint of trade, and void.   In so far as
a common carrier incorporated by a State for public pur-
poses, and intrusted with franchises to be used for the
public benefit, is prevented from using its franchises so as to
accomplish the purposes of the grant, — nay, more, is made
to use them to the positive detriment of shippers, so that
they are forced either not to trade at all, or, by sending
their goods by less advantageous routes, to trade under
difficulties and impediments, — so far there is both a viola-
tion of public policy and a restraint of trade.

The direct loss, not to a particular person or locality, but
to the community and the country, is here apparent.   The

carrier agrees not to make use of, and, therefore, to abandon, a certain trade, namely, the transportation of cars and trains of cars of freights.   The position of the respondent is that, under its obligation to transport freight and passengers to and from St. Louis, the appellant employs the respondent as its instrument.   But this instrument, while capable of doing a particular business, is confessedly incapable of doing another business not named in the contract.   The result of the extension of the contract to this other business is that, owing to want of facilities on the part of the respondent, the business cannot be done.   Thus the contract compels the appellant to abandon this business and to resort to methods which involve delay, injury to goods, and unnecessary expense.   As the appellant is not a private person, capable of removing and exercising the trade elsewhere, but a railway company; as the subject of the contract is not merely a person's trade, but the business of a public carrier, involving a constant succession of interests, so will the injury arising from the abandonment of business be necessarily greater.   The area from which the business will be driven is always an essential element.   *Mitchel* v. *Reynolds*, 1 P. Wms. 181; Smith's Ld. Cas. 508, and cases cited in notes; *Bowser* v. *Bliss*, 7 Blackf. 344; *Oregon, etc., Co.* v. *Winsor*, 20 Wall. 64.   In *Alger* v. *Thatcher*, 19 Pick. 51, a bond by which an individual bound himself not to carry on or be interested in the business of founding or casting of iron was held void.   In *Taylor* v. *Blanchard*, 13 Allen, 370, a contract by which one agreed not to carry on the business of manufacturing shoe-cutters in Massachusetts was held void.   But it is evident that the area may depend upon other things than an extent of country.   The essential question is of monopoly and of injury done to the public. An agreement by A. that he will not exercise trade in a particular town is good; for this tends to create no monopoly, and all but A. may trade there, while A. may trade elsewhere.   The public interests are scarcely affected.   In the

present case, the public injury is great, as the area is vast. The contention of the respondent is, that it has a monopoly, under the contract of 1864, of the ferriage of all passengers and freights coming and going on the appellant's road, across the Mississippi River to or from the Illinois shore, opposite any part of the city of St. Louis. In spite of there being ferries at Venice at the north, and at Carondelet or the southern part of St. Louis, as the evidence shows, none of these passengers or freights can cross by them. However vast may be the business of the appellant's road, all passing to or from St. Louis across the river is, at whatever expense or delay, restricted to this route. Surely, here is a restraint that is neither useful nor reasonable.

The tendency is rather to limit than to extend the sphere of contracts which restrain trade. The wholesome rule is, that the burden is on him who claims under such a contract, to show that it is not of real, as it is of apparent, mischief to the public. The odious nature of monopoly, early recognized by the English law, has become more apparent as commerce has increased. The law fully recognizes the necessity of competition, and here again not only takes notice of but enforces a rule of trade. "That the raising of the price of freights for the transportation of merchandise or passengers upon our canals is a matter of public concern," said Jewett, J., delivering the opinion of the Supreme Court of New York in *Hooker* v. *Vandewater*, 4 Denio, 349, "and in which the public have a deep interest, does not admit of doubt. It is a familiar maxim that competition is the life of trade. It follows that whatever destroys or even relaxes competition in trade is injurious if not fatal to it." So agreements or combinations the effect of which is to prevent or withdraw competition are held to be against the policy of the law, and void. *Morris, etc., Coal Co.* v. *Barclay Coal Co.*, 68 Pa. St. 173; *Crawford* v. *Wick*, 18 Ohio St. 190; *India, etc., Assn.* v. *Kock*, 14 La. An. 168; *Doolin* v. *Ward*, 6 Johns. 194. See also cases

of public sales. *Bellows* v. *Russell*, 20 N. H. 427 ; *Phippen* v. *Stickney*, 3 Metc. 384 ; *Weld* v. *Lancaster*, 56 Me. 453. In the case at bar, that competition which would ensue were the three ferry companies allowed freely to compete for such freights as might have sought the cheapest and best of the three would be destroyed, on the basis of the construction of the contract of 1864 now contended for. The evidence shows, moreover, that the appellant was engaged in close competition, at different points, with rival railway companies having their termini opposite St. Louis. In so far as restraints were imposed upon the appellant, and its facilities for business abridged, it would be unable to compete with rival companies not so hampered. The tendency of competition is, indeed, to cheapen values ; but it is also to promote better and do away with inferior methods ; to make men use advantages to the utmost ; and its withdrawal implies a loss to the community which is great in proportion to the importance and volume of the business involved. In no department of commerce is competition more important, especially in a widely extended country, of various productions, than in that by which the people of such a country communicate with each other and exchange the products of their labor. This competition cannot be maintained if the carrier is seriously weighted in the race ; and, indeed, the argument of the respondent, pushed to its logical results, would end in the abandonment of business by a railway company and the forfeiture of its franchise.

In questions as to restraint of trade, and public policy, it is the injurious tendency which the law looks at as well as the actual result. By refusing to declare contracts of a certain sort void, the law necessarily sanctions them, and by enforcing them encourages their spirit. It seems to be urged that if the appellant does not perform the contract, it can at least pay for non-performance. But if the law refuses its sanction to a contract, it is plain that a violation can create no cause of action.

It is undoubtedly the fact, and in what has been said it has been assumed, that the process by which loaded cars and trains of cars were transferred from the tracks of a railway upon one side of the Mississippi to those of a railway upon the other side, without breaking bulk, was not only comparatively new, but was distinct of its kind, and of great practical utility and benefit to the public as an innovation. Of such innovations the courts may properly take notice, and the changes thus produced must be considered in adjusting the rights of parties. " *Quicquid agant homines,*" said Lord Mansfield, " is the business of courts ; and as the usages of society alter, the law must adapt itself to the various situations of mankind." *Barwell* v. *Brooks*, 3 Doug. 373. " We cannot close our eyes," said the Supreme Court of the United States, speaking of common carriers, and of the manner in which their liability is affected by the customs of trade, " to the well-known course of business in the country." *Bank of Kentucky* v. *Adams Express Co.*, 93 U. S. 185. After bridges and car-ferries had been introduced at other cities upon the Mississippi, and their establishment began to divert trade from St. Louis, it appears there was a strong pressure among those interested for the introduction of the car-ferry system at the latter city. The respondent was aware of this demand. " The most emphatic declaration I ever heard on the subject," says one of its witnesses, " as an illustration, if I may be allowed to go into particulars, was made by the then superintendent of the Wiggins Ferry Company, Capt. Joseph Brown, who stated to me personally, that if he had his way he would have a car-transfer here in thirty days, because public necessities demanded it ; but he could not have his way, and, therefore, ·did not put it in." (This witness subsequently corrected the " thirty days " to sixty or ninety days.) It does not appe ↄ that the appellant interfered to procure either the introduction of the car-transfer system or the car-transfer at the Venice ferry.

The contract between the appellant and the Venice Ferry Company refers to the introduction of such a system, but the evidence does not show that the appellant took steps to carry out the provisions of the contract in that respect. The mere insertion of a provision in the contract, not followed up by acts, is not sufficient to prove bad faith; and as it is not by surmise or suspicion, but by evidence, that we are to be governed, the fact that a director of the appellant was largely interested in the Venice ferry and car-transfer at Venice should not be permitted to bias the mind. Nor is the contract of 1864 to be improperly construed, and an imputation of bad faith on the part of the appellant based upon such a construction. The question at present is as to car-freights, and, as bearing upon these, as to the establishment of the station at Venice and of the car-transfer there. From the testimony, we think the fair and reasonable inference is, that both the station upon the appellant's road at Venice, and the car-transfer there, were the results of growing trade and of the public demands. The appellant, as an incorporated railway company, could not lawfully resist such demands when the public necessities and the regular course of trade had produced these results. As it was bound, upon proper occasion, to provide a station, so it was bound, upon the direction of shippers, to send their car-freights by a ferry which could transfer them. The respondent could neither cross these freights where the Madison County ferry crossed them, nor could it cross them as that ferry company did. The respondent did not, upon the basis of the construction of the contract contended for, have the means to do, " with promptness and despatch," the ferrying required. If the contract covered car-freights, the respondent should have provided means for crossing them. It is idle to say there was no demand by the appellant for a car-transfer. It was the duty of the respondent to avail itself of such means as were attainable for car-freights, if the contract covered such freights; and a demand by the appellant

would have been a mere matter of form when the respondent knew what the necessities of business demanded. There was no concealment that the appellant was transferring car-freights by the Venice ferry. The testimony of the respondent's witness Mullikin shows that notice of this fact was given in 1869 to the respondent. Yet it was not until more than a year after the introduction of a car-transfer at Venice that the respondent had its transfer in operation at Bloody Island. It is said, indeed, that the railroad company should have inserted a provision in the contract, as to car-ferriage, if it desired a new style of transfer; but if the contract includes by implication the new style of freights, it ought by implication to include the new style of ferriage adapted to them. The reply avers that the respondent had ample ability to avail itself of all improvements in transportation as soon as these were made known; but the evidence shows that the car-transfer system and the necessity for its establishment were well known, but that respondent delayed for a long time to adopt it.

But, in addition to the fact that the appellant was thus compelled to use the car-transfer at Venice in order to do its duty as a common carrier in case of car-shipments, there was no connection between the appellant's railroad at its terminus at East St. Louis and the river at that place, and there was no track by which cars could have been switched on to a ferry-boat. Into the facts upon which depended the practicability of making such a connection, whether arising out of the provisions of the contract of 1864, or depending on the nature of the ground or the ownership by another railway company of land between the appellant's yards and the river, it is not necessary to go. It is sufficient that the appellant was not called upon to make such a connection until there was a car-transfer to connect with; and many months before there was a car-transfer at East St. Louis, the course of business, as shown by the directions of shippers and consignees, had taken

another avenue. As the establishment of the car-transfer at Venice is not, so far as the evidence shows, attributable to any action of the appellant; as the appellant company was not the owner of or interested in that transfer or the Venice ferry, it cannot be reasonably contended that, after that transfer was once established, the appellant company was bound to give up the business of transferring these bulk freights at a place where it had convenient access to the river, and (waiving the question of practicability) to establish at East St. Louis a connection with the respondent's ferry. After the car-transfer was established at Venice, the facilities for it which existed in connection with the appellant's railroad were advantages of which the appellant had a right to avail itself. It was under no obligation to do badly, and with risk of delay and expense to shippers, at East St. Louis what it could do well at Venice ; and, apart from the question of practicability of making any connection, the evidence shows that the appellant could not have obtained access to the river at East St. Louis so uninterrupted and so convenient to the public as that which it had at Venice.

It appears that in many instances contracts were made with shippers, or directions were given by them, by which their car-freights were to go by way of the Venice ferry. These directions do not determine the liability of the appellant, but they serve as one test of the application of the rule which has been laid down. The appellant was not bound to turn the course of trade or to divert car-freights from that route to which the interest and convenience of the owner of the property directed it. These directions the carrier could not mistake, and it was justified in obeying them. By the judgment of the court below, which holds the appellant liable for ferriage of the car-freights, the element of the appellant's control is at one time apparently made the basis of an assumed liability, and at another time treated as immaterial. But a still more singular result is worked by this judgment. It is based upon an assumption

that the car-freights, for ferriage upon which the appellant is made liable, would not only have come to St. Louis if there had been no car-transfer at that city, but that there was no increase over the ordinary wagon-freights caused by the establishment of a car-transfer. But the evidence tends strongly to show that many of the car-freights seek only a car-transfer route; that it was the establishment of the car-transfer at Venice that brought many of the car-transfer freights, and largely increased the volume of freights coming to St. Louis.

In addition to what has been said as to the contract of March 9, 1866, between the Venice Ferry Company and the appellant, it is necessary to say only a few words. As above stated, it was what was done under this contract, not what the paper contains, that is the essential matter. The traffic there provided for was traffic restricted to that point where the Venice ferry had its exclusive privileges. No substantial objection arises upon the contract of March 9, 1866, and the supplemental contract of July 11, 1867, if the contract of April, 1864, is properly construed.

The proper scope of the latter contract has already been indicated. Under it the appellant could not take the initiative in building up new industries or devising improvements by which transportation would be diverted from the respondent's ferry; nor could the obligation thus implied interfere with its duty to the public. In its action in regard to freights the appellant acted at its peril; but, in being guided by the directions of shipper or consignee, not instigated or procured by itself, it could not err, for such directions were a sure indication of the necessities of the public and of the course of trade.

For the reasons given, the appellant was not, upon the evidence adduced, liable for ferriage upon any of the car-freights, and the judgment against it was so far erroneous. The judgment is accordingly reversed and the cause remanded, to be proceeded with according to this opinion. All the judges concur.