THE STATE v. THE CENTRAL IOWA R'Y CO. ET AL.

1. **Railroads:** RECEIVING AID BY TAXATION: OBLIGATION TO OPERATE WHOLE LINE: DUTY OF PURCHASER AT FORECLOSURE SALE. The Central Railroad of Iowa was a corporation organized for the purpose of building and operating a line of railway from the south line of the State of Iowa to the north line thereof. The proposed line terminated at Northwood, near the north line of the state. The township in which Northwood was situated was induced to vote a tax in aid of the construction of said road, which tax was collected and paid to said company. The road was afterwards constructed and operated by said company from Albia, in Monroe county, to Northwood, aforesaid. Afterwards the company became insolvent, and its property and franchises were sold under mortgage to the Central Iowa Railway Company, one of the defendants herein. Subsequently the Burlington, Cedar Rapids & Northern Railway Company, the other defendant herein, and which owned and operated a road to Manly Junction, a point on the road first above mentioned, about eleven miles south of Northwood, leased the line of said first named road from Manly Junction to Northwood, and thereafter the Central Iowa Railway Company ceased to operate that portion of its road, but made Manly Junction its northern *terminus*. Upon complaint of the people of Northwood to the railroad commissioners, said commissioners ordered and adjudged that the Central Iowa Railway Company was under legal obligations to equip, maintain and operate its road from Manly Junction to Northwood, and to do so as a part of, and in connection with, its continuous line between Albia and Northwood; and that a failure so to do was a violation of its charter duties and obligations, and contrary to law. *Held* that such order was reasonable and just, and should be enforced, on the grounds, (1) that, by accepting the tax from the township in which Northwood was situated, the original company incurred an obligation to operate its whole road to that place as one continuous line. (2) That such obligation inhered in the franchise, and that the company which took the franchise at the foreclosure sale took it burdened with that obligation. SEEVERS, J., *dissenting*.

*Appeal from Cerro Gordo District Court.*

TUESDAY, MARCH 15.

THIS is a proceeding to compel the defendant, the Central Iowa Railway Company, to equip, maintain and operate that part of its line of road from Manly Junction to Northwood, in Worth county. A mandatory injunction was ordered by the district court in accord with the prayer of the petition. The defendants appeal.

*J. H. Blair* and *Anthony C. Daly*, for Central Iowa Railway Company, appellant.

*S. K. Tracy*, for Burlington, C. R. & N. R'y Co., appellant.

*A. J. Baker, Attorney-general, A. R. Anderson* and *Smith McPherson*, for appellee.

ROTHROCK, J.—The material facts in the case are not in dispute. They are as follows:

. The Central Railroad of Iowa was organized as a corporation on the twenty-third day of June, 1869. The object of the corporation, as declared in its charter or articles of incoration, was "to acquire, construct, maintain and operate a railroad, from the south to the north line of the state of, Iowa, beginning at the state line of Missouri, at or near the terminus of the North Missouri Railroad, and running thence north, on the sixteenth meridian of longitude west from Washington, or as near thereto as practicable." A railroad was constructed from Albia, in Monroe county, north, through the cities of Oskaloosa, Grinnell, Marshalltown, Eldora, and Mason City, to Northwood, the county seat of Worth county, which last-named place is within a few miles of the north line of the state. The road was constructed, and the cars running thereon, to Northwood, in October, 1871. The said railroad company became insolvent, and its creditors placed

its road and other property in the hands of a receiver, and in May, 1879, the road and its franchises were sold upon a decree of foreclosure. The defendant, the Central Iowa Railway Company, was the purchaser at the foreclosure sale This company was organized in May, 1879. In its articles of incorporation the object of the corporation was declared to be "to acquire, construct, equip, maintain and operate a railway from the north to the south line of the state of Iowa, embracing the road and property, both real and personal, of the Central Railroad Company of Iowa."

The road of the Burlington, Cedar Rapids & Northern Railroad Company, successor to the Burlington, Cedar Rapids & Minnesota Railroad Company, is a line of railroad constructed and operated from the city of Burlington, in a northerly direction, through the cities of Cedar Rapids, Vinton, Waterloo, and Cedar Falls, to a junction with the line of the Central Iowa Railroad at Manly Junction, about eleven miles south of Northwood. In the year 1877, and while the Central road was under the management of the receiver, he made a contract with the Burlington, Cedar Rapids & Northern Company, by which both of said companies run their trains over the line from Manly Junction to Northwood, to the same depot. The Burlington, Cedar Rapids & Northern Company constructed a road from Northwood to the north line of the state, and on to Albert Lea, there connecting with another line to St. Paul, Minnesota. The last named company, by this joint running arrangement, was thus enabled to operate through trains from Burlington to St. Paul. It has ever since that time operated through trains between the points named, using the road from Manly Junction to Northwood as part of the line. Both roads continued to use and operate that part of the line between the points last named until the year 1881, when they entered into a written agreement by which the Burlington, Cedar Rapids & Northern Company took full possession of the road from Manly Junction to Northwood, as lessee of the Central Iowa Railway

Company. By the terms of this lease the lessee agreed to pay $14,000 per year to the lessor as rent, and to keep the road in repair, pay all taxes and assessments upon that part of the road, and to have the exclusive use of the same for twenty-five years. Exclusive possession was taken by the lessee under this agreement, and since it was executed such possession has been retained, and the Central Iowa Company has not since that time run its trains north of Manly Junction.

In the year 1870, at a special election held in the township in which Northwood is situated, a tax of five per cent upon the taxable property was voted to aid the Central Railroad Company in constructing its railroad through said township. The tax, amounting to $12,608, was collected and paid to the company. There were also certain lands at Northwood conveyed to the company for depot purposes, by private parties, for which no money consideration was paid. A conveyance of certain alleged swamp lands was made by the county to the company, but, as the company took no lands of any value by the conveyance, this alleged aid to the road demands no consideration.

The proceedings in the case at bar originated before the railroad commissioners of this state, under chapter 133 of the Laws of 1884. The people of Northwood made complaint to the commissioners, and the defendants herein were cited to appear, and such proceedings were had that on the thirteenth day of February, 1883, the said commissioners ordered and adjudged "that the Central Iowa Railway is under legal obligations to equip, maintain and operate its road from Manly Junction to Northwood, and to do so as a part of, and in connection with, its entire and continuous line between Albia and Northwood; and that a failure to so equip, maintain and operate the portion of the road between Manly Junction and Northwood, and its entire road, is a violation of its charter duties and obligations, and contrary to law." The Central Railroad Company refused to comply with this

order, and this action was brought to compel obedience thereto.

The statute above cited provides that the rulings, orders and regulations of the railroad commissioners, for the direction and guidance of railroad companies in this state, may be enforced by proper decrees, injunctions and orders in the district court, and that the proceedings therefor shall be instituted by the attorney-general in the name of the state. Said act further provides that "if the court shall find that such rule, regulation or order is reasonable and just, and that, in refusing compliance therewith, said railway company is failing and omitting the performance of any public duty or obligation, the court shall decree a mandatory and perpetual injunction, compelling obedience to and compliance with such rule, order or regulation. * * *"

The ultimate question to be determined in the case is this: Has the Central Iowa Railway Company the legal right to lease that part of its road from Manly Junction to Northwood, and surrender the exclusive use of it to another company, and cease to operate its line north of Manly Junction? It is not claimed in behalf of the plaintiff that the defendant had no legal right to lease its line of road, and we fail to discover why such a lease would not be valid. If the whole line were leased and operated by another company, the integrity of the line would be preserved, and the people of Northwood would have the same means and facilities for transportation from one end of the line to the other as if the owner of the road should retain possession of it and operate it. But the complaint is that by the lease and surrender of part of the line, Northwood is practically deprived of the use of the whole line of road, because it is, in effect, situated some eleven miles north of its northern terminus. The question to be determined is one of very great importance. It involves the rights of railroad companies to lease parts of their roads, and thus destroy or break up a continuous road, and deprive localities of the benefit of competing lines; and whether a

sale of a railroad under a decree of foreclosure releases the purchasing company from the obligations and liabilities which its predecessors owed to the public, and what are the rights of the public in such cases.

Railroad companies have the undoubted power to mortgage their property, (*Dunham v. Isett*, 15 Iowa, 284,) and, as we have said, the power of a railroad company to lease its whole line of road is not questioned. Indeed, the power to lease is expressly given by section 1300 of the Code. We come, then, to the question whether the Central Iowa Railway Company had the power to lease the part of its line involved in this controversy. And it is proper, at the outset, that some general principles applicable to the relation between the state or sovereignty and corporations be stated. A corporation is created by legislative power. It can have no power to do any corporate acts without legislative authority, and its power and authority are limited to such acts as are expressly given to it by its charter, or such as are necessarily implied from the powers expressed. Formerly, corporations were chartered by special act of the legislature. Now, they are incorporated under general laws, which, with the articles of incorporation adopted by the incorporators, create the same relation between the state and the corporation which would exist if the general laws applicable to the corporation and the articles of incorporation were embodied in a special act of the legislature creating the corporation, and defining its powers. A railroad corporation differs in some important respects from private corporations in general. It cannot acquire the right to construct its road over private property, against the will of the owner, without an exercise of sovereign power. Eminent domain is an attribute of sovereignty, and, when a railroad company condemns land for right of way upon which to construct its road, it is not the act of an individual. It is the exercise of sovereign authority, and the corporation is the agency through which the state executes the power. And this state authorized towns,

cities, and townships to vote taxes to railroad companies to aid in the construction of their roads. This also was an exercise of sovereign power. It is true, the power was not exercised by railroad corporations. But the law authorized taxes to be voted by the legal voters upon all the property in their towns and townships; and those who voted against the tax, and the owners of property who were not voters, were required to pay the tax voted upon them.

The people of Northwood voted the tax, collected and paid it to the railroad company, to the end that they might secure the benefits of the line of road then being constructed by the Central Railroad Company. They did not extend this aid for the building of a line through their township alone. It cannot be admitted that they would have been willing to aid in the construction of a railroad having its beginning and ending in their township without any connection with any other railroad. It is claimed, however, that this is a mere private controversy between the people of Northwood and the railroad company; that no public right is involved; and that the voting of a tax did not create any contractual relations between the tax-payers and the railroad company; and we are cited to *Railway Co. v. Horton*, 38 Iowa, 33; *Trust Co. v. Davis County*, 6 Kan., 257; *Railway Co. v. Kenton*, 12 B. Mon., 144 (150); and other cases. But these were all cases brought to enforce the levy or payment of taxes, or the issue of bonds in pursuance of a vote of the people. It may be admitted that no contract exists between the people and the railroad company; but when taxes are voted, collected and paid to the company, and it has thus availed itself of public aid from taxation, it assumes a relation to the public of a higher and more sacred character than a mere contract between private individuals. It would be at war with every principle of natural justice to hold that it might avail itself of this public aid, and then violate its obligations to the public incurred by reason of the aid thus received.

It is insisted by counsel for appellants that the authority

given by section 1300 of the Code to any railroad company, to sell or lease "its railway property and franchises," includes the power to lease any part of the line, upon the principle that the power to lease the whole includes the power to lease a part. We think this does not follow. If a lease of a part of the line is a breach of a just and binding obligation to the public, the lease would be illegal. It may be assumed that the Central Railroad Company was not bound to construct the road. A railroad corporation is under no legal obligation to construct a railroad because of its articles of incorporation. Its charter is not a contract with the state to build a railroad. *People v. Albany & Vt. R. Co.*, 24 N. Y., 261. But, having constructed and put in operation its road, in part at least, by public aid in the way of taxation, the right to abandon or rather turn over part of its line to another company, to the injury of any locality on the line, is quite another question. We do not undertake to determine the question whether, under the mere charter rights of the corporation to build and operate its road, the corporation may abandon part of its line, or lease it to another company, so as to destroy competition at points on the line. There appears to be a conflict of authority upon this question. See *Black v. Canal Co.*, 22 N. J. Eq. 410; *Com. v. Fitchburg R'y Co.*, 12 Gray, 180; *State v. Hartford & N. H. R'y Co.*, 29 Conn., 538; *Peoria & R. I. R'y Co. v. Coal V. M. Co.*, 68 Ill., 489. It would seem from some of these authorities, and others cited by counsel, that a corporation may abandon its line, and cease to operate it for good and sufficient cause; and, in the case where the business of a railroad will not pay operating expenses, it would be a most unjust rule to require it to be operated by proceedings in *mandamus*. But that question is not necessarily in this case. The Central Railroad Company was the recipient of more from the public than the mere right of invoking the power of the state to condemn land for a right of way. It received taxes from the public, levied and collected to aid in the construction of the road.

Its relation and obligation to the public are therefore different from that of a company not having received any such aid.   It appears from chapter 118, of the Laws of 1876, that it was contemplated by the legislature that the obligation to operate a railroad is incurred by accepting taxes in aid of its construction.    That act in effect provides that, upon a proper proceeding, a railway line may be changed or removed, but upon the condition that all such taxes shall be repaid.   It is true, the act applies to such railroads only as were constructed prior to the year 1866, and probably is not applicable to the road in question.    But the act indicates that the legislature regarded the obligation to operate the road, as contemplated by the company when it accepted the aid, as binding upon it.

II.   We come now to another question in the case, and that is, whether this obligation to operate the road passed with the foreclosure sale, and became binding upon the defendant to the same extent as against its predecessor.   In other words, did the Central Iowa Railway Company take the road by its purchase charged with the duty of operating it to Northwood?   Counsel for the defendants strenuously insist that by the purchase the defendant acquired the road clear and free from any such claim.   It is to be remembered that when the decree of foreclosure was entered, and the road sold, and the sale approved, and the property conveyed, the old company was, for all practicable purposes, wiped out of existence.   With the sale of its road, right of way, depot buildings, side tracks, and all the appliances necessary to operate the road, the franchise, or right to operate the road, passed with the sale.   It is true, the purchaser took the road unincumbered by the debts of the old company.   But the obligation to operate the road to Northwood was more than a debt.   It inhered in the franchise, so to speak, and pertained to the right to operate the road.   It did not pass by an assignment proper; it passed to the grantee as a burden or limitation upon the right to operate the road. *Campbell v. Marietta & C. R. Co.*, 23 Ohio St. 168.

Without further elaboration, our conclusion is that the Central Iowa Railway Company had no power to execute the lease, and thus abandon the part of its line in controversy, and compel its former patrons at Northwood to transport passengers and freight some eleven miles to reach the terminus of a railroad which the defendant was bound to maintain at Northwood. We think that the order of the railroad commissioners, which was approved by the district court, was "reasonable and just," and should be complied with. It will be understood that we do not determine that a contract providing for a joint running arrangement over that part of the line from Manly Junction to Northwood would be illegal. It is the surrender by the Central Railway Company of any right to operate the line, and giving the exclusive right to the Burlington, Cedar Rapids & Northern Railway Company to operate it, that we hold to be unauthorized by law.

AFFIRMED.

SEEVERS, J., (*dissenting*.) When the state granted to railroad corporations the right to mortgage their incorporate property, it clearly was contemplated that the mortgages might be foreclosed, the property sold, and purchased either by a natural person or another corporation. This being so, what does the purchaser obtain at the sale? Without doubt, I think, he gets the mortgaged property, and the right to operate the road. Unless he obtains the latter, the property would be comparatively valueless, and the right to mortgage a barren, instead of a substantial, right. In my judgment, the purchaser obtains a perfect and absolute title to the mortgaged property, except against valid and existing liens of record, or of which the purchaser has express notice.

It is not claimed, in the foregoing opinion, that the tax, or any right or obligation growing out of it, constituted a lien on the mortgaged property. Nor is it claimed that the acceptance of the tax created a contract of any kind between

the corporation executing the mortgage and the state, or any citizen thereof. In my judgment, the right to mortgage not only exists, but may be exercised freely by the corporation, as its interest may dictate. The corporation may execute a mortgage on a part of the road at one time, and afterwards upon another part. Upon the foreclosure of such mortgages, the road may be severed, and thereafter adversely operated. This was the case with the Des Moines Valley road. When the purchaser obtains a railroad under a foreclosure and sale under a mortgage, he may use and control it as he sees proper, unless he is prohibited from so doing by some statute, and I do not understand that it is claimed there is such a statute. On the contrary, the statute provides that the owner may lease the road. This necessarily includes the power to lease the whole or a part, unless the owner has entered into some contract or assumed some obligation to the public or individuals which prevents him from so doing. In this case the existing corporation entered into no such contract or obligation. It is a separate and distinct corporation, organized under the statute, and exists independently of the prior corporation. It therefore cannot be said to have assumed an obligation of the prior corporation, of which it had neither express nor constructive notice. This, it seems to me, must be true, in the absence of a statute which either expressly or by necessary implication so provides. In my judgment, the district court erred in entering the decree it did.