STATE OF IOWA ex rel. JAMES BROWN et al., Appellants, v.
RALPH H. BEATON et al., Appellees.

**RAILROADS: Discontinuance.** A railway may not be discontinued or dismantled except in strict compliance with the special procedure provided by statute (Secs. 2092 *et seq.*, Code, 1897), whether the railway be owned by a corporation or an individual.

**JUDGMENT: Amendment in Vacation.** A judgment may not, long after its entry, and in *vacation*, be modified by inserting therein a material provision which has not been asked for in any pleading, and which vitally affects parties who have never been made parties to the action. So held where the purchaser under foreclosure of a railway was authorized "*to operate, discontinue, or dismantle.*"

**RAILROADS: Duty of Purchaser Under Foreclosure.** Purchasers of a railway at foreclosure must continue the operation of the road.

**RAILROADS: Discontinuance—Hopeless Bankruptcy.** The court will not order the equipment and operation of a railway which has never earned operating expenses, and is a hopeless bankrupt.

**RAILROADS: Conditions to Abandonment.** A return of all donations is a condition precedent to the legal abandonment of a railway. (Sec. 2095, Code, 1897.)

**ESTOPPEL: Delayed Intervention.** No estoppel can be predicated on the conduct of a stranger to an action in delaying his intervention in the action until he has reason to know that the action is being converted into an illegal engine of destruction to his rights.

**APPEAL AND ERROR: General Denial of Abstract.** Appellant's *general* denial of an abstract availeth nothing, and in such case the court will presume that the record is sufficiently presented to cover all questions raised.

**APPEAL AND ERROR: Nonappeal by State—Effect.** Failure of the *State* to appeal from a decree permitting the abandonment of a railway in no wise affects the right of taxpaying and other donors to appeal.

**JUDGMENT: Entry of Record—Sufficient Showing.** A recital in an abstract that "*the following decrees were signed and filed of record*" on a named date, aided by the presumption that the clerk did, within a reasonable time, perform his duty with reference to recording them,

is sufficient to show that the decrees were actually entered of record. (Secs. 287, 4114, Code, 1897.)

**JUDGMENT: Entry on Appearance Docket.** A formal, signed judgment or decree, on being filed with the clerk, should be noted in the appearance docket. (Sec. 291, Code, 1897.)

*Appeal from Union District Court.*—HOMER A. FULLER, Judge.

JUNE 11, 1920.

SUPPLEMENTAL OPINION DECEMBER 14, 1920.

THE Creston, Winterset & Des Moines Railroad Company was organized in 1911, with its principal place of business at Creston. Its railroad was constructed nearly parallel with the Chicago, Burlington & Quincy Railroad from Creston through Spaulding, and then in a northeasterly direction through Zion and two other stations to Macksburg, a distance of 21½ miles. It appears to have been completed early in 1913, and to have been operated after a fashion until November, 1918, when a week was required to move the last train from Macksburg to Creston. At first a train went back and forth once a day, but later made round trips three times a week; though, later on, freight trains were run only when amount of freight warranted doing so. Many of the ties had become decayed, and little repairing was done in 1918. The estimate that 500 ties per mile are necessary to replace rotten ones was not contradicted. A local committee at Macksburg furnished $500 per month toward meeting the expenses of operation during 1918. The territory served is about 180 sections; but, owing to the poor service and inefficient management, about 50 per cent of the patronage has been lost, or never enjoyed. The rails with which it is equipped weighed 60 and 65 pounds, but these seem heavy enough for the purposes of the road. It appears that it has never earned operating expenses, to say nothing of interest charges and taxes, none of which were paid. About July 1, 1912, the company issued bonds in the sum of $200,000, in denominations of $500 each, and secured the same by the execution of a trust deed to Theodore S. DeLay, Clarence Wilson, and A. S. Lyon, as trustees. Suit to foreclose this mortgage was begun on June

15, 1914, owing to the failure of the company to meet the interest charges, the prayer being for the appointment of a receiver to take charge of the property pending foreclosure proceedings, and that the property be sold by the receiver, and the proceeds applied to discharge the indebtedness. Clarence E. Wilson was appointed receiver, January 5, 1914, and a decree entered as prayed, February 18, 1915, in which Wilson was continued as receiver, and the property ordered sold by him as such, April 14, 1915, in a manner prescribed, and subject to confirmation by the court on report of sale within 20 days, the court reserving the right to reject any sale made, and, in its discretion, by supplemental decree to require a readvertising and a resale of said property. No sale appears to have been made on the day designated, and, on October 24, 1918, E. B. Marsh, a receiver appointed to succeed Wilson, filed an application, alleging that the road was being operated at a financial loss, and without insurance under the Workmen's Compensation Act; that the roadbed was run down, and in a defective condition; that running trains was dangerous; and other matters not necessary to enumerate. He therefore prayed the court for an order authorizing him to make a sale of said property. This was presented to his honor J. H. Applegate, one of the judges of the district in which the road was situated, in vacation, and order made that five days' notice of the hearing be given to the attorneys of record representing creditors, and to the board of railroad commissioners, such notice to be by registered mail. These notices were duly mailed, and, on October 31st, the time fixed for the hearing, Judge Applegate found and ordered:

"That the said railroad property is being operated by said receiver at a financial loss; that it is being operated without insurance under the Workmen's Compensation Act, and that the receiver has no funds for acquiring such insurance; that the roadbed of said railway is in a bad and dangerous condition for want of ties; and that the operation of trains over the same in its present condition is attended with great danger of wrecks and serious injury to the employees, and danger of damage to property; that it will be for the best interest of all parties concerned if said property is sold by the receiver at this time; that the said property will sell to a better advantage if sold

with the right to the purchaser to continue to operate the same, or to abandon its operation or dismantle the same as he should elect; that this court, in the original decree entered herein on the 18th day of February, A. D. 1915, reserved the right to make any such additional orders or decrees as might be necessary or required to carry out the purpose of this action and of said decree; that notice of the hearing of this application has been duly and legally served, as required by the order of this court dated October 24, A. D. 1918. It is therefore ordered, adjudged, and decreed that the said E. B. Marsh, a receiver herein, proceed to give notice of sale, and to sell all of the property in his hands as such receiver at public auction, such sale to be made under the provisions of the decree of this court dated February 18, A. D. 1915, as amended from time to time by the orders of this court, and as amended by this order, such sale to be held on the 9th day of November, A. D. 1918, at 10 o'clock in the forenoon of said day, at the south front door of the courthouse in Winterset, Madison County, Iowa; that such sale be for cash in hand within 30 days of the approval thereof by this court or one of the judges thereof; that the sale be made with the right to the purchaser to operate said property or to discontinue such operation or to dismantle said property at his election.''

The following related to the manner of advertising and conducting the sale, and is not involved in this action. The receiver sold the property at public auction at the time designated, and presented his report thereof to the same judge in vacation, to Ralph H. Beaton and S. Ornstein for $30,000. This report was approved, and a deed transferring the property, subject to a tax lien of $8,358.37, indorsed therewith and delivered. The plaintiff James Brown, for himself and all other persons in like situation, alleged, in the petition filed June 7, 1919, in substance, the facts recited, and also that taxes had been voted for the construction of the railroad in Union Township of Adair County, and Grand River Township of Madison County, and the taxes so voted, amounting to about $30,000, collected and paid over to the said company; that the right of way was, in large part, donated, as was also about $20,000 in value of labor and money; that, in 1913, the railroad was con-

structed and put in operation, in accordance with the represen-
tation held out by the company, in reliance on which the con-
tributions were made and taxes voted; and that it had been con-
tinued in operation as a public carrier until about October 9,
1918. The plaintiff further alleged that, since the acquirement
of the said railroad by defendants Beaton and Ornstein, its
operation as a common carrier had ceased, and no efforts to oper-
ate it since then had been made; but that, on the contrary, they
had been and are engaged in dismantling said railroad, and
transporting the material, equipment, and property connected
therewith from Union County, and had elected to dismantle and
discontinue said railroad as a common carrier; and that the
rights, benefits, and convenience and advantages of same will be
lost to plaintiff and others whom he represents. It is alleged,
also, that said railroad can be successfully operated as a common
carrier; that charges and tariffs now permitted are far in excess
of those allowed during the period said road was in operation,
and greater revenue can be derived by the owners; and that
plaintiff believes there is now Federal legislation pending in aid
of railroads, which will be helpful in the successful operation of
said road. Plaintiff alleged further that the defendants gave
no notice whatever to those who donated money, labor, or
property to the building of same, or to the trustees of the town-
ships in which taxes were voted, and have taken no legal pro-
ceedings, as provided by law, under which they might be author-
ized to remove said railroad; that there has been no judicial
determination of the earning capacity thereof, nor of the right
to discontinue its operation; that there has been no adjudication
by court with jurisdiction concerning the discontinuance of the
operation thereof, or the dismantling or removal and hauling
away of the materials thereof, nor has the consent of the donors
or trustees or other persons to the removal thereof been obtained,
nor repayment made of any contributions or taxes received, or
for labor performed; that, though repeatedly requested to con-
tinue the operation of the railroad, defendants have utterly
failed so to do. The plaintiff therefore prayed:

"(1) That the defendants be required to equip, maintain,
and operate all of said railroad not removed, and rehabilitate
and reconstruct all of said railroad heretofore dismantled, and

to return and restore all equipment, rolling stock, or other property of said company, and to proceed at the earliest convenience to again operate said entire road as a common carrier, in compliance with the franchise heretofore granted to the same.   (2)   That the defendants be permanently enjoined and estopped from further dismantling said road, or from removing any of the property thereof, and from doing any and all things detrimental or adverse to the future operation of said property as a common carrier.   (3) That, in event upon further hearing it should be found that said road cannot be successfully operated as a common carrier, then plaintiffs pray that defendants be compelled to proceed as required by law to remove the same and repay in money or property all donees who have contributed in any wise by money, labor, or property to the construction and building of said railroad, and that said defendants be compelled to fill up all cuts and level down all banks, in event of removal of same, or any part thereof.   (4) That a mandatory injunction issue, restraining the defendants from committing the wrongful acts alleged, and fully protecting plaintiff from irreparable injury.   (5) That the court grant such other full and adequate relief as may be found equitable in said premises.''

Defendants Beaton and Ornstein answered, admitting having acquired the road under the foreclosure sale, and that they had not operated the road as a common carrier, and had made no effort so to do; and alleged that, during this time and long prior thereto, the property was in such a run-down and dilapidated condition that it was impossible to so operate the same, without great danger to the lives of those running trains thereon. They admitted, further, that no notice of any kind had been given to any person, firm, or corporation, and that they had taken no legal proceedings on their part in any court regarding the property.   They alleged that the right to discontinue operation of the railroad was passed on in the foreclosure proceedings heretofore referred to, and deny that any demand has been made upon them to operate the road.   By way of defense, they say that they purchased the railroad at the receiver's sale heretofore mentioned; that same was made under the order entered by the judge in vacation, as heretofore recited; and that, by the terms thereof, ''the purchaser had the right to operate said

railroad or discontinue the operation thereof or to dismantle the same;'' and that, a short time after the purchase, these defendants sold to their codefendants, Nathan Harris and Louis Greenberg, all the personal property belonging to and forming a part of said railroad property, including the steel rails; and that, since such sale, these defendants have had and now have no right, title, or interest in and to any of the property so sold by them to their codefendants. They allege further that, prior to the time they purchased the property at receiver's sale, the road was not in operation, and was not in a condition to operate as a railroad, and had not been in such condition; that this could not safely have been done for some years prior to said sale; that there were not sufficient ties or ballast in the right of way or track of said railroad to safely operate even the shortest trains; that many of the ties were decayed, and the rails not firmly fastened thereto; that to rehabilitate the same so that the railroad could be operated safely would require the expenditure of several hundred thousand dollars, and that the defendants were without means to incur such expense. The defendants Nathan Harris and Louis Greenberg, in their answer, admitted not having made any effort to operate the railroad, and that they have been and are engaged in dismantling said property, and are expecting to remove the same from Union Township; that, about December 3, 1918, they purchased at private sale from Beaton and Ornstein, but acquired no claim to any real estate or right of way, or to any franchise rights of said company. The other allegations are like those in the answer of Beaton and Ornstein. The attorney general of the state later filed a petition of intervention, by leave of court, in behalf of the state, in which he re-alleged and affirmed all the matters and facts contained in the petition of Brown, and, by reference thereto, adopted the same as a part of his petition, and prayed for like relief. Another petition of intervention was filed by E. V. Masters and O. P. Tillman, also adopting the original petition filed by Brown and Ornstein, and joining him in the prayer for relief. The cause was heard, and decree entered, dismissing the several petitions. The plaintiff Brown and interveners, Masters and Tillman, appeal.—*Reversed.*

*Brown & Ferguson,* and *O. M. Brockett,* for appellants.

*Higbee & McEniry, Fred Bernstein,* and *Stipp, Perry, Bannister & Starzinger,* for appellees.

LADD, J.—From the facts as above recited, it appears that the Creston, Winterset & Des Moines Railway Company was organized in 1911, completed its line of railway from Creston via Spaulding and Zion to Macksburg, a distance of 21½ miles, early in 1913. About July 1, 1912, the company executed a mortgage thereon, to secure bonds in denominations of $500 each, to the amount of $200,000, to trustees; and, as no interest thereon or taxes were paid, proceedings to foreclose, and for the appointment of a receiver, were begun, June 15, 1914. A receiver was appointed, and later, on February 18, 1915, a decree was entered, as prayed, directing the receiver to sell without right of redemption said railroad, "together with all the right, title, estate, and interest of said railroad company of, in, and to all and singular the several pieces and parcels of land upon which is established the roadway of said railroad; the tracks, rails, bridges, yards, stations, grounds, buildings, fences, fixtures, the right of way and privileges and franchises appurtenant or thereto belonging; the rolling stock, including locomotives, tenders, passenger cars, baggage, express cars, mail cars, freight, stock, and dumping cars, flat cars, and all other cars of every kind and description which are now or may hereafter be owned by the railroad; all machine shops, car shops, blacksmith shops, and other shops situate upon or appurtenant to said railroad; all machinery, stationary engines and buildings, and all articles used in constructing, replacing, and repairing said railroad engines and in the operation thereof; together with all material in the machine shops, car shops, and other shops, together with all articles and implements; together with the equipment, working, operating, conducting, and repairing of said railroad now owned or hereafter to be acquired by said railroad company, all of which chattels are declared to be fixtures and appurtenances of said railroad, and are to be deemed and taken as part thereof, including its rights and franchises as a corporation, and all the

1. RAILROADS: discontinuance.

right, title, interest, and property whatsoever, as well in law as in equity, of said railroad company of, in, and to the same, and as in any and every part thereof, with the appurtenances thereunto belonging.''

The day of sale was fixed, as well as conditions thereof, and the right was reserved by the court to reject any sale, and by supplemental decree or order to require a readvertisement and resale, and jurisdiction was retained to enter any further orders or decrees. This decree also established priority of certain labor claims, and directed the proceeds of the sale to be applied (1) on costs, (2) on certain claims, and (3) on the mortgage indebtedness. The property was not sold at the time fixed, and, on October 24, 1918, the receiver applied to Judge J. H. Applegate, one of the judges of the district in which the railroad was located, in vacation, for an order directing the sale of the property pursuant to the decree, representing that the expense of operation of the railroad exceeded its income; that he was without means to pay for insurance under the Workmen's Compensation Act; that the roadbed was in such run-down condition as to render it much more dangerous to operate trains over than ordinary railroads, and that a large outlay would be required to put it in good working condition, which the receiver did not have; that, owing to the high price of labor, coal, and other things required to continue to operate the road in its present condition by a receiver, operation thereof will result in further loss and debt; that there is at present, as this receiver believes, an opportunity to sell the said property; and that a sale of the property to persons able to handle the road will be for the best interest of all persons concerned. His honor fixed the date for hearing, directed five days' notice to be given to attorneys in the foreclosure proceedings and to claimants therein and to the board of railroad commissioners, by registered mail, which was done, and, on the day designated, made an order, in vacation, directing the receiver to sell the property described above on November 9, 1918; ''that the sale be made with the right to the purchaser to operate said property or to discontinue such operation or to dismantle the said property, at his election.''

The clause quoted does not appear in the original decree, nor was it asked in the application of the receiver. The sale

was made at the date fixed; but whether this option was announced at the sale does not appear from the receiver's report, and it does not appear whether it was incorporated in the deed executed by the receiver and approved by the judge. The sale was approved, and such approval indorsed on the deed, and that instrument delivered to Beaton and Ornstein, upon payment of $30,000, less taxes constituting a lien on the property. The purchasers did not operate the railroad; but shortly afterwards sold all personal property connected with the railway, including rails and ties, to Harris and Greenberg, who proceeded to dismantle the road by removing the steel rails and shipping them away.

This recital, though somewhat extended, seems essential to a correct understanding of the questions raised, which we shall dispose of in convenient order.

I.   The validity of the decree of foreclosure is not assailed; though one of appellants' attorneys contends that the sale made was invalid. Such an issue is not raised in the pleadings. The

2. JUDGMENT:
amendment in
vacation.

allegation of the petition is that "since the acquirement of said railroad by the defendants" they have not operated it, but have been and are proceeding to dismantle it, without pursuing the course required by Sections 2092 to 2098, inclusive, of the Code. To this, appellees respond by pleading the order of Judge Applegate, permitting purchasers at the sale "to operate, discontinue, or dismantle." The contention of appellants is that this feature was void; and it must be so regarded. The decree contained no such privilege. It merely ordered the sale of the property described; and the purchaser at the sale acquired the railroad property burdened with the same obligations with reference to its preservation and operation as bound the railroad company. As held in *State v. Central Iowa R. Co.*, 71 Iowa 410:

"When the decree of foreclosure was entered, and the road sold, and the sale approved, and the property conveyed, the old company was, for all practicable purposes, wiped out of existence. With the sale of its road, right of way, depot buildings, side tracks, and all the appliances necessary to operate the road, the franchise, or right to operate the road, passed with the sale.

It is true, the purchaser took the road unincumbered by the debts of the old company. But the obligation to operate the road to Northwood was more than a debt. It inhered in the franchise, so to speak, and pertained to the right to operate the road. It did not pass by an assignment proper; it passed to the grantee as a burden or limitation upon the right to operate the road.''

See, also, *State v. Iowa Cent. R. Co.*, 83 Iowa 720. Sale under the provisions of the decree would transfer the railroad and property used in connection therewith, burdened with the obligation to operate the same as a common carrier; and a judge in vacation was without authority to modify a decree entered by court. *Whitlock v. Wade,* 117 Iowa 153; *Marengo Sav. Bank v. Byington,* 135 Iowa 151; *Baff v. Waller & Waller,* 181 Iowa 1072. That the judge's order had this effect is beyond question. The decree ordered the property to be sold in its entirety. Jurisdiction to modify the decree was retained by the court, but not

3. RAILROADS: duty of purchaser under foreclosure.

by a judge in vacation. Such a sale would have transferred it burdened, as seen, with all its duties to the public. Among these was that of operating the railroad as a public carrier; and certainly, directing sale without such duty, and with the privilege of abandoning or dismantling the railroad, was a vital modification of the decree. Moreover, the public has a distinct interest in the operation of a railroad. The charter is granted to a corporation for that specific purpose, and to accomplish this, it is endowed with the power of exercising the sovereign powers of eminent domain, in acquiring a right of way, and it may be the recipient of taxes voted by the people, and may receive other donations. These grants are upon the implied understanding that the corporation will construct and operate its railroad as a perpetual highway of travel and commerce. These are given by the state to railroad corporations to be exercised only on the theory that such public rights are to be used to promote the general welfare. Having obtained the franchise, and having exercised the powers of eminent domain, and of raising money through taxation, the corporation is without privilege, in the absence of the consent of the state, to abandon the enterprise, tear up the tracks, or sell the rolling stock, rails, and other parts of its property. Such a course would defeat the

very object of the enterprise on the faith of which taxes were voted, property donated, and franchise granted. As said in *Gates v. Boston & N. Y. A. R. Co.*, 53 Conn. 333:

"The possible effects of the exercise of such a claimed power are utter disaster to the great interests of the state, certain destruction of private property, in which whole communities created and existing upon the faith of the continuous use of the chartered powers are interested; and, indeed, the life of the citizen, as well as his property rights, are thus jeopardized. Upon principle, it would seem plain that railroad property once devoted and essential to public use must remain pledged to that use, so as to carry to full completion the purpose of its creation; and that this public right, existing by reason of the public exigency, demanded by the occasion, and created by the exercise by a private person of the powers of a state, is superior to the property rights of corporations, stockholders, and bondholders."

Railroads are constructed to answer a public object, and are bound to the state for the performance of their public duty. Their owners can do no act which would amount to a renunciation of their duty to the public, or which would directly and necessarily disable them from performing it. If the railroad is mortgaged, this is subject to its obligations to the public, and a purchaser upon foreclosure acquires the property subject to its trust relation to the state. In *State v. Dodge City, M. & T. R. Co.*, 53 Kan. 377 (42 Am. St. Rep. 295), an injunction to restrain the company from tearing up and removing the track, ties, and iron from the roadbed was denied in the trial court, and, in reversing the ruling, the court said:

"While the title to a completed railroad is vested in the corporation, it is only private property in a qualified sense. Railroads, like all other public thoroughfares, are public instrumentalities. The power to construct and maintain railroads is granted to corporations for a public purpose. The right to exercise the very high attributes of sovereignty, the power of eminent domain and of taxation, to further the construction of railways, could not be granted to aid a purely private enterprise. The railway corporation takes its franchises subject to the burden of a duty to the public to carry out the purposes of the charter. The road, when constructed, becomes a public instru-

mentality, and the roadbed, superstructure, and other permanent property of the corporation are devoted to the public use. From this use neither the corporation itself nor any person, company, or corporation deriving its title by purchase, either at voluntary or judicial sale, can divert it, without the assent of the state. It matters not whether the enterprise as an investment be profitable or unprofitable, the property may not be destroyed, without the sanction of that authority which brought it into existence. Without legislative sanction, railroads could not be constructed. When once constructed, they may only be destroyed with the sanction of the state. The legislature unquestionably has the power to authorize the abandonment of railroads, when they cease to be of public utility. It may be, also, that, in an action prosecuted by the attorney general, on behalf of the State, to forfeit the charter and wind up the affairs of a railroad corporation, for any proper cause, the court might make all necessary orders for the disposition of the property of the company; but, in this case, the State appeared, by the county attorney of the county in which the road was located, protesting against the removal of the superstructure of the road. The court erred in refusing the injunction asked.''

See, also, *People v. Louisville & N. R. Co.*, 120 Ill. 48; *Pierce v. Emery*, 32 N. H. 484; *State v. Sioux City & P. R. Co.*, 7 Neb. 357; *Brownell v. Old Colony R. Co.*, 164 Mass. 29 (49 Am. St. 442).

Manifestly, the judge in vacation might not terminate the obligation to operate this railroad for the use of the public, when that issue had not been presented in the pleadings; when the parties directly interested had not been afforded the opportunity to be present; and in contravention of statutes prescribing the manner of such termination.

II. As seen, the company held the railroad property impressed with the obligation or duty of operating it for the public good. The mortgage or trust deed covered the railroad in its entirety, and was subject to the burden mentioned. The decree of foreclosure directed the sale of the property in its entirety. The order of the judge in vacation, purporting to so modify the decree as to confer the right to dismantle on a purchaser, was void. Since it is void, it is immaterial whether this suit is

a direct or collateral attack; for, in that event, either is available. That feature of the order at least was surplusage. Whether the purchase was in reliance thereon, we have no means of knowing; for the receiver's report was silent thereon, and the deed does not appear in the record. Had the decree been modified by the court, as was done in *Gilchrist v. Waycross Street & S. R. Co.*, 246 Fed. 952, a different question would be presented. Here, the sale was of the entire property under the decree, if at all, and the purchasers acquired the property burdened with duties and obligations to the state, precisely as it was when owned by the mortgagor; and any act of Beaton and Ornstein, with respect to such property, tending to impair their ability, or in the nature of a renunciation of their duties or obligations to the state, was illegal, and may be enjoined. The attempted sale of the steel rails and other property, as Harris and Greenberg well knew in bargaining for the same, would render all the railroad impossible of operation, and terminate its use for the public good.

III. The plaintiff prayed that defendants be required to equip and operate all of said railroad not removed, and reconstruct that portion which has been dismantled, and that they 

4. RAILROADS: discontinuance: hopeless bankruptcy.

restore the equipment and rolling stock and other property of the company, and operate said entire road as a common carrier hereafter. Ordinarily, the owner of a railroad may be compelled to perform the obligations which it has assumed to the public. Having constructed and operated its railroad over its line under the powers and privileges of its franchise, it cannot, at its option or caprice, abandon the same and tear it to pieces, but is bound to perform those functions of a common carrier which it has undertaken. But the railroad under consideration has never been so operated as to earn any surplus above operating expenses, has earned nothing with which to keep it in repair, pay taxes, or meet interest charges. During the last year previous to the sale, $500 per month over and above its earnings was required to meet the deficit in operating expenses. An estimate that 500 ties per mile were so rotted as to require replacing, was not controverted. So dilapidated had it become that a week was required in moving the last train over the entire line, a distance

of a little over 21 miles. To rehabilitate the road would require the expenditure of a large amount of money, and this without any reliable assurance of ever receiving any return thereon; for, in the light of what experience has .demonstrated during a period of five years in attempted operation, we are not inclined to be over-credulous in weighing the testimony of experts who expressed opinions that the railroad might be operated at a profit after meeting the operating expenses, interest on fixed charges, and taxes. As bearing upon this subject, see *State v. Old Colony Trust Co.*, L. R. A. 1915 A, 549, and note in which cases bearing hereon are collected. See, also, *State v. Dodge City, M. & T. R. Co.*, 53 Kan. 329 (24 L. R. A. 564), where the court, speaking through Horton, C. J., said:

"The question is whether the court will compel, or attempt to compel, the railway company, a bankrupt corporation, to relay the track and repair the roadbed. The court will not make a useless or futile order. It will not do a vain thing. The order prayed for should only be issued in the interest of the public. If the track is replaced, there is no reasonable probability that the road will be or can be operated. If a railway will not pay its mere operating expenses, the public has little interest in the operation of the road, or in its being kept in repair."

That case was much like the one at bar, as was *State of South Carolina v. Jack*, 145 Fed. 281, where a like conclusion was reached. Defendants may not be compelled to restore at a large outlay and operate at a loss. *Brooks-Scanlon Co. v. Railroad Com.*, 40 Sup. Ct. Rep. 183. See *Northern Pac. R. Co. v. Washington Territory*, 142 U. S. 492 (35 L. Ed. 1092). We are of opinion that, in view of the showing made, defendants ought not to be required to rehabilitate and operate the railroad.

IV. As seen, a railroad, having been constructed under a franchise and with powers conferred by the state for a specific service to the public, may not abandon such service or appropriate the property thereof without the consent of the state, manifested in such manner as by statute prescribed, nor can the property so set apart or the proceeds thereof be disposed of otherwise than pointed out by the statutes apparently enacted to meet such a situation. Section 2092 of the Code provides that:

"Any railroad desiring to change or remove the line of its road, after the same has been permanently located and constructed, may file a petition in the district court in any county wherein the change or removal is proposed to be made, describing with reasonable accuracy that portion of its line which it seeks to have changed or removed, and asking the court to grant authority to make such change or removal. All trustees, mortgagees and other lien holders, and all townships, cities and counties which have aided by taxation to build the road, must be made defendants and served with notice as in other actions."

Section 2093 of the Code:

"A public notice to all whom it may concern of the time of filing such petition, the object thereof, and the term of court at which the application will be made for authority to make the change, and requiring all persons desiring the repayment of money or return of property, as in this chapter provided, to appear and present their claims therefor, must be published in a newspaper printed in each county in which the change is to be made, for a period of ten successive weeks before the term of court at which the application is to be heard. The court may order any additional notice or publication that it may think proper."

Section 2094 of the Code:

"No railway company shall be allowed to change or remove its line of road, after a permanent location and construction, without repaying all moneys, and restoring all property, or its value, which were donated to the company building the same exclusively in consideration of said railroad's being located and constructed on such line, to the parties donating the same, their heirs or assigns, nor without first procuring the consent of all parties having liens upon the railroad, and of any township, city or county that by taxation or by the issuing of bonds has contributed money to aid in the construction thereof; but the consent of such township, city or county shall be necessary only with reference to the change to be made within its own territorial limits."

Section 2095 of the Code:

"If the court finds that notice has been given, and the

consent of the proper parties has been obtained, it shall ascertain the amount of money or property contributed to the company by any person or party thereto or appearing therein that was so contributed exclusively in consideration that the road should be located on the line from which it is proposed to remove it, which shall be repaid in case of money, and returned if property, or its value fixed, and in either case shall render judgment therefor, and may also enter a decree authorizing, if the public interest demands it, the removal of or change in the line of said road upon condition that all judgments above provided for be first paid or satisfied, and foreclosing all persons or parties not appearing in the action, and forever barring them from asserting any claim against such company on account of the contributions or donations herein mentioned.''

Section 2096 of the Code relates to a situation where the railroad is relocated, and Section 2097 of the Code provides that:

''For the purpose of this chapter, the trustees of each township shall be served with notice and shall represent and act for it. No vested right of any person or persons living on and along the line of any railroad thus removed shall be defeated or affected by the removal.''

Section 2098 of the Code relates to a situation where the road is relocated.

It seems plain that the above statutes have reference (1) to the change of line of a railroad from one location to another location and also (2) to the removal of the line of railroad without relocation. The consequence to the particular community would be practically the same. The theory of these statutes seems to be that all donations and taxes voted and received shall be restored to those parting with same, before the corporation constructing the railroad or those claiming under it shall take any of the proceeds. Since contributions have been made with the understanding that the railroad shall be continuously operated as a common carrier at a definite locality, neither the company nor those claiming under it may abandon such undertaking without restoring what has been received, upon failure to keep the faith.

5. RAILROADS: conditions to abandonment.

We are of opinion that the railroad might not be removed otherwise than authorized by the statutes quoted.

V. Counsel for Harris and Greenberg contend that no evidence of donations ''to the company building the same exclusively in consideration of said railroad's being located and constructed on such line'' was adduced. This may be conceded. *Old Colony Trust Co. v. Wickard Bros.*, 224 Fed. 913. There was evidence, however, that taxes were voted and collected in two townships through which the railroad was constructed, amounting to about $30,000, and that such amount was collected and paid over to the railway company, to aid in the construction of its railroad. True, the exact amount was not shown. It was enough, if any such taxes were received, to exact that the company should not remove the railroad without resorting to procedure under the sections of the Code quoted. The amounts may be fixed when the action contemplated is brought.

VI. It is suggested that the statutes do not apply to individuals owning a railroad. Section 2092 of the Code reads: ''Any railroad desiring to change or remove,'' etc. Evidently a word has been omitted, or railroad has been personified, for use in lieu of ''owner.'' Construed in the light of the context, it is evident that ''owner'' of a railroad is intended, and we are of opinion that the word ''company'' is employed in that sense. Surely, the general assembly had no intention of discriminating between corporate and individual owners of railroads ''permanently located and constructed.''

It is said that it was not made to appear that the railroad in controversy was ever so located and constructed. The evidence without conflict showed that it was completed early in 1913, and was operated for more than a year by the company, and thereafter for several years by a receiver. Nor had the operation of the road been entirely abandoned when the defendants purchased it.

Again, it is argued that any rights which the plaintiff, or those he represents, and interveners had, were lost by standing by and interposing no objection. They were not required to assume that the purchasers at the receiver's sale 6. ESTOPPEL: delayed intervention. would proceed contrary to law, and there was no occasion for them to complain until informed

that defendants were proceeding in violation of the statutes quoted. Suit was not unreasonably delayed thereafter.

VII. Some practice questions are raised. There is a motion to dismiss the appeal, for that all the evidence is not before the court, based on a general denial of the abstract. Such a denial is of no effect. *Kossuth County St. Bank v. Richardson,* 132 Iowa 370. In such a case, the abstract with amendments is presumed to contain the record with sufficient completeness to enable the court to pass on the questions raised. *McGillivary Bros. v. Case,* 107 Iowa 17.

7. APPEAL AND ERROR: general denial of abstract.

The attorney general, in behalf of the State, filed a petition of intervention, alleging the facts set out in the petition, and, "by reference and adoption, makes said petition a part of the petition" by him filed, and prayed for the same relief. He did not, however, join in the appeal, and it is contended that, for this reason, the appeal should not be entertained. Sanction having been given to the prosecution of the suit in the trial court, such sanction is not withdrawn by the officer's omission to perfect an appeal. The only interest of the State is that donors and taxpayers, and any others interested, be fully protected by procedure appropriate for that purpose. It was without direct interest, and for this reason the omission to appeal will not be allowed to prejudice relator or others interested. *People ex rel. Garrison v. Clark,* 72 Cal. 289 (13 Pac. 858); *People ex rel. Rondel v. North San Francisco H. & R. Assn.,* 38 Cal. 564. The court should have enjoined defendants from dismantling the railroad or removing any portion thereof from the counties in which located.—*Reversed.*

8. APPEAL AND ERROR: non-appeal by State: effect.

WEAVER, C. J., GAYNOR and STEVENS, JJ., concur.

### SUPPLEMENTAL OPINION.

LADD, J.—The point that this court had not acquired jurisdiction, for that the abstract did not show that the final decree had been spread on the record book, was overlooked in preparing the opinion. This is the only question presented by appellees in their petition for rehearing. The abstract recited that:

**9. JUDGMENT:** **entry of record: sufficient showing.** "Immediately following the conclusion of plaintiff's evidence in rebuttal, the cause was submitted, whereupon the court rendered its oral opinion, in pursuance of which the following decrees were signed and filed of record on January 30, 1920."

Then followed a form of decree, duly signed by the trial judge, duly filed. The notices of appeal were served on April 2, 1920, more than two months subsequent to the filing of the said form. Did this recital of the abstract show a decree spread on the record book kept by the clerk, as required by Section 288 of the Code? An appeal may not be taken or perfected until the decree rendered is entered in the record book, and for this reason jurisdiction of this court appears from the abstract only when enough is stated to indicate (1) the entry of the decree of record, and (2) the service of necessary notices of appeal. That the appeal was perfected is not questioned. The point made is that, though the form of decree was signed and filed of record January 30, 1920, this was not sufficient showing that it was spread in the record book April 2d following, or more than two months afterward. The language construed in *Martin v. Martin,* 125 Iowa 73, was: "On the 12th day of September, 1901, the court made and filed the following judgment and decree;" and later on, that the appeal was taken "within six months of the rendition of said decree." Notices of appeal were served on the 20th of the same month and year, or only eight days subsequent to the filing of the form for decree. The appeal was there dismissed, for that the abstract did not show the entry of the decree in the record book kept by the clerk.

The court seems to have been in error in saying that there is no provision for the filing of such papers; for Section 291 of the Code requires the clerk, immediately on the filing, to "make

**10. JUDGMENT:** **entry on appearance docket.** in the appearance docket a memorandum of the date of the filing of all petitions, demurrers, answers, motions, *or papers of any other description in the cause.*" The form of a decree signed by the trial judge is one of the papers in a case, upon filing of which memorandum should be made in the appearance docket. As noted in *Martin v. Martin,* supra, it is merely a more specific direction as to the decision to be entered, than an oral announce-

ment or memorandum entered in the judge's calendar. Its sole purpose is that of prescribing the precise form of decree to be spread in the record book by the clerk. Thereupon, it becomes the duty of the clerk to enter the decree of record. The object of such an entry is to furnish an enduring memorial and incontestable evidence of the decree, and to fix definitely the date of rendition, for the purposes of appeal and attachment as a lien. At the common law, a judgment took effect as of the first day of the term; but in this state, only from date of entry. The importance of prompt entry in the record book is apparent. Such book is the best evidence of a judgment or decree. Execution may not issue until it has been recorded, and until then it does not become a lien. If without sufficient time to enter it of record during the term, he may postpone it, and this seems to have been the practice prevailing at common law. Freeman on Judgments (4th Ed.), Section 40. But, owing to the great importance of preserving the record accurately, securing to the judgment plaintiff the advantages of a lien, and affording the defeated party the opportunity to appeal, the clerk is required to enter all judgments and decrees as promptly as may be, in view of other official duties, and in any event within a reasonable time after their rendition. As the presumption prevails that the clerk, like other officials, performs his duties, and his duty was to enter of record promptly, it is to be inferred, from the signing and filing of record of the form of decree, that the same appears in the record book, after the lapse of a reasonable time within which to record. Over two months intervened between the filing of the form of the signed decree and the perfecting of appeal, and, in the absence of any denial, the same will be presumed to have been entered by the clerk in the record book. This phase of the case was not considered in *Martin v. Martin,* supra, doubtless because only eight days intervened between the filing and appeal. *Bach v. Interurban R. Co.,* (Iowa) 174 N. W. 333 (not officially reported), merely followed, as was supposed, the *Martin* case, without giving any consideration to whether a presumption of the entry of a decree after the lapse of a reasonable time should be indulged. We are of opinion that enough appeared in the abstract to indicate the entry of the decree in the record book, and that the challenge of this

court's jurisdiction on the original submission and in the petition for rehearing should be, and it is, overruled. The petition of appellee also is overruled.

WEAVER, C. J., STEVENS and ARTHUR, JJ., concur.